CHAPMAN & DEWEY LAND COMPANY *v*. BIGELOW.

Opinion delivered January 6, 1906.

1. SUIT TO QUIET TITLE—PLAINTIFF'S TITLE.—In suits to quiet title the plaintiff is not entitled to recover unless he be in possession, or his title be equitable, or, having the legal title, the land be wild and unoccupied. (Page 346.)

2. SAME.—In an action to quiet title to wild and unoccupied land, plaintiff must succeed, if at all, upon the strength of his own title, and not upon the weakness of his adversary's. (Page 347.)

3. RIPARIAN RIGHTS—MEANDER LINES OF GOVERNMENT SURVEY.—Where the United States survey meandered the boundary lines of certain fractional sections along the bed of a certain non-navigable stream, purchasers from the State of the land so meandered, being part of the Swamp Land Grant, will be held to have acquired only to the middle of the channel of such stream, and not to have acquired, by virtue of their riparian rights, unsurveyed land beyond such stream which is swampy and subject to inundation, but is, to some extent, reclaimable for agricultural purposes. (Page 350.)

4. EVIDENCE—HEARSAY.—A letter from the Secretary of the Interior to the Commissioner of the General Land Office, expressing his opinion as to the title to the land involved in a suit in a State court, was inadmissible where there was no contest before his department which called for a decision. (Page 350.)

Appeal from Poinsett Chancery Court; EDWARD D. ROBERTSON, Chancellor; affirmed.

*Frierson & Frierson, Ashley, Gilbert & Dunn,* of Kansas City, Mo., and *Robert S. Rodgers,* for appellant.

1. Meander lines along or near the margin of a stream or other body of water are run to ascertain the quantity of public land sold, and are not boundary lines; the waters themselves constitute the real boundary. By the common law, fresh water lakes and ponds, not navigable, belong to the owners of the adjacent soil, who own *usque ad filum aquae.* 140 U. S. 371; *Ib.* 406; Gould on Waters (1900 Ed.), § 196; 42 L. R. A. 305, note; 25 Ark. 120; 24 Ark. 102; 50 Ark. 471; 51 Ark. 491; *Ib.* 233; 83 S. W. 951.

2. Plats and field notes are the best evidence of the condition of the *locus in quo* at the date of the Swamp Land Grant. 39 Fed. 66.

3. The decision of the Secretary of the Interior, based on plats, field notes and other records, is final on the question whether the fractional sections were properly meandered on a permanent body of water, and whether the region designated on Government plats as water has ever been selected and approved to the State under the Swamp Land Grant. 46 Ark. 17; 33 Ark. 833; 71 Ark. 491, and cases cited. See also 129 Fed. 1; 189 U. S. 120.

4. Nothing can pass to the State as swamp land until identified as such by the Secretary of the Interior. 168 U. S. 588.

5. Parol evidence was inadmissible to show that the land was at the date of the Swamp Land Grant in fact swamp land. 159 U. S. 332; 149 U. S. 79; 71 Ark. 491.

6. The region in controversy will be presumed to be a non-navigable body of water. 39 Ark. 403; 21 Am. Eng. Enc. Law, 429, note 6 to subd. c. Where a river runs through a lake or pond, the main channel will be the boundary, in case of recession of the waters. Gould on Waters (1900 Ed.), § 196, and cases cited; 37 Am. Dec. 545; 40 Ark. 501.

*N. W. Norton,* for appellees.

1. The letter of the Secretary of the Interior was inadmissible as evidence. There had been no contest before the department, and the letter was a mere matter of correspondence, to which appellant was a stranger.

2. The Swamp Land Act of September 28, 1850, passed title *in praesenti* to the States to all lands of that character, and the lists and plats required to be made by the Secretary of the Interior were means of indentifying such as were swamp lands. 20 Ark. 100; 24 Ark. 431; 29 Ark. 56; 9 Cal. 322; *Ib.* 544; 27 Cal. 87; 121 U. S. 488.

3. Under the proof, the unsurveyed land was land at the time of the Government survey. It does not belong to appellant as an appurtenance to the surveyed shore. Land cannot be appurtenant to land. 10 Pet. 25; Rose's Notes on U. S. Rep. vol. 3, 544; 13 Am. Dec. 657, notes.

4. Meander lines bordering on navigable streams are run, not as boundaries, but to define the sinuosities of the stream, and to ascertain the quantity for land for which the purchaser must pay. 7 Wall. 272. The courts will hold that the surveyor was,

in this case, mistaken in conceiving that he had reached the main body of the water, and the line be held as a boundary.    159 U. S. 40; 4 Neb. 245; 75 Iowa, 20; 78 Wis. 240; 82 Wis. 147; 1 Black, 204; 85 Fed. 45; 41 Ohio St. 696; 54 Pac. 195.

5.    The township was surveyed, and passed as a whole, and title to the unsurveyed lands also passed.    33 So. 628; 138 U. S. 584; 57 Pac. 912; 74 N. W. 705; 121 U. S. 488.

BATTLE, J.    Chapman & Dewey Land Company, a corporation organized under the laws of the State of Missouri, brought a suit against Charles H. Bigelow, N. P. Bigelow, L. T. Walker and F. H. Hartshorn to quiet title to certain lands, and for that purpose to have declared void and of no effect certain conveyances under which the defendants claim title thereto.

Plaintiff claims title under an act of Congress entitled "An act to enable the State of Arkansas and other States to reclaim the Swamp Lands within their limits," approved September 28, 1850.    It alleges that, in pursuance of the provisions of this act, surveyed sections and parts of fractional sections in fractional township twelve north of the base line, in range six east of the fifth principal meridian, and in township twelve north of the base line, in range seven east of the fifth principal meridian, and in Poinsett County, in this State, were duly selected, approved and patented to the State of Arkansas as a part of the Swamp Land Grant; that certain of these lands were conveyed by the State of Arkansas, on the 12th day of June, 1871, to Moses S. Beach; that plaintiff acquired, and is the owner of, these lands so conveyed to Beach, as well as certain other of the lands which were deeded to the State of Arkansas by the United States; that many of the legal subdivisions of sections so acquired by plaintiff were bounded by a large body of non-navigable water called in the official surveys of the United States and field notes thereof as the "Sunk Lands," "St. Francis River Sunk Lands," the "Hatchie Coon Sunk Lands," and the "Cutoff Lake;" that the legal subdivisions so bounding were fractional, and in the survey were meandered along such body of water.    The plaintiff thereupon claims the lands lying under this body of water; and these are the lands in controversy in this suit to which it (plaintiff) seeks a decree to quiet its title as against the defendants.    Plaintiff alleges that these lands are wild, unimproved and unoccupied,

and that the defendants are claiming them under certain deeds; and asks that these deeds be declared void, invalid, and of no force whatever.

The defendants answered, and denied that the so-called "Sunk Land" was a body of water, or that it is shown to be by the surveys of the United States or the field notes; but alleged that it was sometimes temporarily flooded with water, and was land bearing "trees and vegetables, willow and cypress;" and that the meandered lines run as alleged by plaintiff were run as boundaries, and not for the purpose of finding the number of acres in the sections or legal subdivisions "for which purchasers would have to pay when the Government might dispose of the land."

The chancery court, after hearing the evidence adduced by all the parties, dismissed the complaint for want of equity, and rendered judgment in favor of the defendants for costs; and the plaintiff appealed.

We have attempted to state briefly so much of the pleadings in the case as presents the issue for our consideration. Before noticing the facts, we will consider the law of the case.

In *Hardin* v. *Jordan,* 140 U. S. 371, the court, after an extensive review of authorities, held that, "by the common law, under a grant of lands bounded on a lake or pond which is not tide-water and is navigable, the grantee takes to the centre of the lake or pond, ratably with other riparian proprietors, if there be such."

*Horne* v. *Smith,* 159 U. S. 40, was an action to recover the possession of certain lots. "Plaintiff's title rests on a patent from the United States, dated March 20, 1885, conveying lot numbered seven of section twenty-three, and the lots numbered one and two of section twenty-six, in township twenty-nine south, of range thirty-eight east of Tallahassee meridian in Florida, containing one hundred and seventy acres and forty-two hundredths of an acre, according to the official plat of the survey of the said lands returned to the General Land Office by the surveyor general.' The official plat of township 29 was in evidence, which showed that sections 23 and 26 were fractional sections bordering on the Indian River. On this plat a meander line runs through the sections from north to south, the Indian River being on the west thereof. The east line of the sections is, so far as these lots are concerned, the ordinary straight line of government sur-

veys. In the south half of the southeast quarter of section 23 is lot 7. The area of that lot is given as 73.06 acres. The northeast quarter of section 26 is divided into lots 1 and 2. The area of lot 1 is 54.90 acres, and of lot 2, 42.53 acres. The boundary lines of these three lots are all straight with the exception of the meander line on the west. The length of the section line between lot 7 and lot 1, extending from the east section line to the meander line on the west, is stated to be 30.55 chains. Along the course of this meander line, as shown on the plat, runs, according to the testimony, a bayou or savannah opening into Indian River, and west of this bayou, and between it and the main waters of the river, is a body of land extending in width a distance of a mile or a mile and a quarter, and amounting to some 600 acres. This is a body of low land, in some places, however, from four to six feet above the level of the river, and covered with a growth of live oak trees, many of them three and four feet in diameter. · It was not land formed by accretion since the survey."

Mr. Justice BREWER, in delivering the opinion of the court, said: "But the question in this case is whether the boundary of these lots is the bayou or the main body of the river. That a water line runs along the course of the meander line cannot, of course, in the face of the plat and survey, be questioned, but that the meander line of the plat is the water line of the bayou, rather than that of the main body of the river, is evident from these facts. In the first place, the area of the lots is given; and when that area is stated to be 170 acres, it is obvious that no survey was intended of over 700 acres. In the second place, the meander line, as shown on the plat, is, so far as these lots are concerned, wholly within the east half of sections 23 and 26, while the water line of the main body of the river is a mile or a mile and a quarter west thereof, in sections 22 and 27. Again, the distance from the east line of the section to the meander line is given, which is less than a quarter of a mile, while the distance from such east line to the main body of the river must be in the neighborhood of a mile and a half. Further, the description in the patent is of certain lots in sections 23 and 26, and, manifestly, that was not intended to include land in sections 22 and 27. These considerations are conclusive that the water line which was surveyed, and made the boundary of the lots, was the water line of the bayou or savannah,

and there has been simply an omission to make any survey of the tract west of the bayou, and between it and the main body of the Indian River."

Again he says: "But it is said that, because the water mentioned on the plat is called Indian River, the boundary must be taken as the water line of the river, and cannot be that of any intermediate bayou. * * * In the case before us, obviously, the surveyors surveyed only to this bayou, and called that the river."

*French-Glenn Live Stock Company* v. *Springer,* 185 U. S. 47, was an action to recover possession of a certain tract of land. "To support its contention, the plaintiff in error put in evidence, at the trial, an official plat of the government survey of township 26 south, range 31 east of the Willamette meridian, showing the township rendered fractional by abutting upon the meander line along the south side of Malheur Lake, which plat appears to have been approved by the Land Department and filed in the local land office on September 17, 1877. The plat shows lots 3 and 4, section 34, and lots 1 and 2, section 35, as bounded on the north by the meander line of Malheur Lake." The plaintiff in error purchased these lots of the State of Oregon. He contended that he bought in reliance upon the plats and patents which showed the meander line of the lake, and that "such plats and patents must be deemed to conclusively establish that the lake was the northern boundary of the land, so far as the rights of riparian grantees are concerned." The court held, that "while, if there was a lake abutting on or to the north of the lots, the plaintiff would take all land between the meander line and the water, and all accretions, it was competent for the defendant to show that there was not, at the time of the survey nor since, any such lake, and to contend that in such a state of facts there could be no intervening land, and no accretion by reliction."

In *Niles* v. *Cedar Point Club,* 175 U. S. 300, the facts are, in part, as follows: "In the years 1834 and 1835 Ambrose Rice, a deputy surveyor, surveyed and subdivided into sections and quarter sections fractional township 9 south, in range 9 east, and townships 9 and 10 south, in range 10 east, the same being situated in the northern part of Ohio and adjacent to Lake Erie. From his field notes, duly certified to the surveyor general of that

land district, the latter prepared a correct plat of the townships, showing the subdivisions thereof, and marking all the actual survey lines and the errors designated by said survey. By the field notes and plat, certain sections appear to be fractional, the line on the north being meandered in a general direction from the northwest to the southeast. The tract to the north of this line was described as 'flag marsh' and 'impassable marsh and water.'

\*     \*     \*     \*     \*     \*     \*     \*

"In 1881 John B. Marston, under instructions from the General Land Office, surveyed and subdivided into sections and quarter sections the area marked upon the surveyor general's plat, above referred to, as 'flag marsh' and 'impassable marsh and water.' \* \* \* Disclosing the condition of these lands, paragraphs. 16 and 17 of the statement of facts are as follows:

" 'At the time of the making of the survey by Ambrose Rice the waters of Lake Erie were above their ordinary stage, and there was more than the usual volume of water standing upon the land in controversy herein and flowing to and upon the same from the large bodies of land now in Ottowa, Wood and Lucas counties, respectively, having their drainage to and through the said premises in controversy herein.

" '17. The general character, description and condition of the said land surveyed by said Marston was by him correctly set forth under the title 'General Description' in the field notes of the said survey so as aforesaid by him certified to the Commissioner of the General Land Office.

" 'That concerning the portion of said survey in township 9 south, range 9 east, reciting, towit:

" 'The surface of that part of this fractional township comprised in this survey is covered with a deep marsh of grass, canes or reeds, wild rice, etc. Many parts of it, particularly in the south and west parts, are mown for a kind of a coarse hay. Other parts are filled with bogs and pond holes that do not dry in summer. It receives the natural drainage from the woods on the south and west, which, without any well-defined channel, finds its way across the marsh to the lake. Again, in heavy gales of wind it is subject to inundations from the lake, which, upon subsidence of the gale or change of direction in the wind, slowly finds its way out again into the lake. It is bounded along the lake

by a sand beach averaging 1 chain in width and 3 feet in height.

" 'That concerning the portion of said survey in township 9 south, range 10 east, reciting, towit:

" 'The surface of this fractional township is covered with a deep marsh of grass, canes or reeds, wild rice, etc. Much of the south part can be mown for marsh hay, being in a measure drained by a canal that has been constructed in the township south. Other parts are filled with bogs and pond holes that do not dry in summer. It receives the drainage from the woods on the south and west, which spreads over the entire surface and without any positive channel finds its way to the lake. Again, the township is subject to inundations from the lake during heavy gales of wind, which, upon the termination of the gale or a change in the direction of the wind, slowly finds its way back into the lake.' "

We should have stated before this that "in July, 1844 (before the Marston survey was made), patents for several of the fractional sections facing on the marsh were issued to Margaret Bailey, under whom the appellant claims; that the patents each recite the number of acres granted, and each states that the tract is a fractional section, 'according to the official plat of the survey of said lands returned to the general land office by the surveyor general, which said tract has been purchased by the said Margaret Bailey.' " After the Marston survey the lands surveyed by him were patented by the United States, and the title so conveyed passed by subsequent deeds to the appellee. The controversy in the case was between the appellant, claiming it by virtue of its contiguity to other lands conveyed to his grantors by the United States before the Marston survey, and the appellee, who claims under a patent of the United States. The appellee's title was sustained.

Mr. Justice BREWER, delivering the opinion of the court, said: "Generally, these meandered lines are lines which course the banks of navigable streams or other navigable waters. Here it appears distinctly from the field notes and the plat that the surveyor, Rice, stopped his survey at this 'marsh' as he called it. These surveys were approved, and a plat prepared, which was based upon the survey and field notes, and showed the limits of the tracts which were for sale. The patents, referring in terms to the

survey and plat, clearly disclose that the Government was not intending to and did not convey any land which was a part of the marsh. 'The patent itself does not contain all the particulars of the survey, but the grant of the lands is recited to be according to the official plat of the survey of said lands, returned to the general land office by the surveyor general, thereby adopting the plat as part of the instrument.' * * * In *James* v. *Howell,* 41 Ohio State, 696, 707, the Supreme Court of Ohio, speaking of these very patents and this marsh, said: 'The meander line along the southerly border of the marsh was, in fact, intended to be the boundary line of the fractional sections.'"

Again he says: "It is impossible to hold that the lower courts erred in the conclusion that this marsh was not to be regarded as land continuously submerged, either under Lake Erie, a navigable lake, and in that case belonging to the State of Ohio, * * * or under a pond or other similar body of non-navigable inland waters, and therefore generally the property of riparian owners. It was called a marsh by Rice, the first surveyor, is so styled on the plat, and the conditions, as disclosed by the agreed statement, indicate that it was a body of low swampy land, partly boggy and partly dry, sometimes subject to inundations from Lake Erie or the overflow of the adjacent streams, but not permanently covered with water.

  *     *     *     *     *     *     *     *

"But it is urged that the fact that a meandered line was run amounts to a determination by the land department that the surveyed fractional sections bordered upon a body of water, navigable or non-navigable, and that, therefore, the purchaser of these fractional sections was entitled to riparian rights; and this in face of the express declaration of the field notes and plat that that which was lying beyond the surveyed sections was 'flag marsh,' or 'impassable marsh and water.' But there is no such magic in a meandered line. All that can be said of it is that it is an irregular line which bounds a body of land, and beyond that boundary there may be found forest or prairie, land or water, Government or Indian reservation."

In suits to quiet title the plaintiff is not entitled to recover unless he be in possession, or his title be equitable, or, having the legal title, the land be wild and unoccupied. *Mathews* v. *Marks,*

44 Ark. 436; *St. Louis Refrigerator & Wooden Gutter Co.* v. *Thornton,* 74 Ark. 387. The lands in controversy are wild and unoccupied. The possession of them follows the title. Hence appellant must succeed, if at all, as in actions of ejectment, upon the strength of its own title, and cannot rely upon the weakness of its adversary's, and the burden is on it to show title. *Lawrence* v. *Zimpleman,* 37 Ark. 644, 647; *Kelley* v. *Laconia Levee District,* 74 Ark. 202; *St. Louis Refrigerator & Wooden Gutter Co.* v. *Thornton,* 74 Ark. 387.

Appellant claims the land in controversy by virtue of the contiguity of certain lands, acquired by it from the United States, through the State of Arkansas and other grantors, to what is called "Sunk Lands" and "Cutoff Lake." This "Sunk Land," from appellant's land on one side to the St. Francis River, a navigable stream, on the other, is three, four and six miles wide. In this area there are over ten thousand acres. The field notes and plat introduced as evidence show the condition of only those sections, and that was on the 30th of May, 1849. John W. Garretson, who surveyed the sub-divisional lines and meanders of township 12 north, range 6 east, made this note in his record of surveys:

"May 30, 1894. The water is at a medium stage at this time, and it is utterly impossible to get to the part of the south boundary of section 36, T. 13 N., R. 6 E., which was run by Mr. James M. Danley. The Hatchie Coon Sunk Lands, on the west side of which I closed the meanders in Sec. 2, T. 12 N., R. 6. E., is so deep at this time that it cannot be waded. The east boundaries of Secs. 24 and 25, T. 12 N., R. 6 E., I passed in December, 1848, in a canoe; there was water then on them from 8 to 10 feet deep, and no timber except groups of willow and small cypress trees, such as grow in the main Sunk Lands of the St. Francis River. Mr. Samuel Johnson, it seems, established corners in this lake, as it is called, on the north side of the right-hand chute of Little River, which right-hand chute is very similar to the ground through which the lines, viz.: east boundary of Secs. 24 and 25, T. 12 N., R. 6 E., run. I have stated this much in order to show the utter impossibility of running lines or meanders from any corners on the above-named boundaries, only at the dryest season of the year. The part of the ground through which east boundary

of Secs. 24 and 25 lies is called Cutoff Lake, and the south bound-ary of Sec. 36, T. 13 N., R. 6 E., could not be reached by Mr. Samuel Johnson, who run the east boundary of T. 12 N., R. 6 E., at the time he run said boundary.

"JOHN W. GARRETSON,

"*Deputy Surveyor.*"

He indirectly says the lands mentioned could be surveyed at the dryest season of the year, and says that two of the sections had on them "groups of willow and small cypress trees."

The maps introduced as evidence in the hearing of this cause show that fractional sections 6, 7, 18, 19, 30, 35 and 36 form the western boundary of what is called "Sunk Lands," in controversy. James Anthony, an experienced and skilled civil engineer, testi-fied that in 1876 he found that the Government meander lines of these sections followed the old steamboat channel, known as the "Old River," which at one time was navigable. The fact that the meander lines followed the channel of Old River is *prima facie* evidence that it was the water line of these sections when the meander lines were run, and was the stream meandered.

The official maps show that Cutoff Lake was the water boundary of fractional sections 35 and 36.

What lay beyond these water lines or boundaries in what is called "Sunk Lands"? These sections were surveyed by the Government about 1848 or 1849. They were conveyed by the United States to the State of Arkansas by two patents, dated, respectively, July 29, 1852, and September 27, 1858; and the State conveyed all of them, except sections 6 and 7, on the 12th of June, 1871, to Moses S. Beach, from whom appellant deraigns title. On these various dates there is no direct evidence to show the condition of the lands in controversy. Claiming them by virtue of its riparian rights, the burden is upon appellants, if it succeeds at all, to show their condition. It has failed to do so.

James Anthony, who has known the land since 1874, three years after the State of Arkansas conveyed lands to Moses S. Beach, as before stated, testified as follows:

"Timber grows all over the land; cypress and cottonwood on the outskirts of that land, both on the river and on the meander line. The center of the land in sections 10, 15, west half of 11, west half of 14, is the highest land in that country, comparing it

with both sides of the river, and it is known as 'Gum Island,' and the timber on these lands, this 10, 15, west half of 11, and west half of 14, is oak, some cottonwood, red gum, mulberry, some hickory and [the land] is also covered with a dense undergrowth of spice wood. Between these lands, which I have said are known as 'Gum Island,' and the land within the meander line, known as "Hatchie Coon," the country is low, swampy and in some places going as wide as a thousand and twelve hundred feet between high land and high land and narrowing down in places to seventy-five and one hundred feet wide. I have followed the meander line through 4, 3 and 2, about which Mr. Briggs and Mr. Odom testified. I made those meander lines. As to the difference in the timber and land on one side of that line and the other, the timber on the 'Hatchie Coon' property is oak and gum, and on the south, in between the two islands, cypress principally and some little cottonwood. I have known that country since 1874. It is known as the 'Sunk Lands.' It is possible at times to walk across that country. The best crossing is through 6, 12, 11, and 10, and through 9. There is an old wagon road that goes through there, and there used to be a ferry. By 6 I mean section 6 in 12-7."

Asked as to the nature of the country south of this crossing, with reference to the possibility of being crossed by team or horses or by foot, the witness said: 'Well, what you call by foot, you mean across this country anywheres, as far as wagons are concerned, you would have to leave these middle sections out, and then you could cross through 35, 34 and 33 with wagon or otherwise. It could not be crossed on foot in the south half of 24 and the south half of 22. By wading you can cross anywhere. There is water in section 23. There may be a little flag in 14. The flag openings commence in the northeast corner of 2; they go down through section 2 to the east half of section 11, and the east half of 14, and from the south line of section 14 they turn due west, running out between sections 14 and 23 and 15 and 22, and are here known as 'Lead Fork Slough.' In section 26 there is what is known as the 'Scatters.' That is more or less over the section. There are bunches of timber covering 25 or 30 acres, and these bunches of timber are surrounded by flag openings. There may also be a little of that in 25, but very little. 25 is

pretty high ground; it is ash and oak. 25 is known as 'Ash Camp.' "

This testimony is strongly corroborated by the testimony of other witnesses.

Were the lands in controversy higher in 1874 and since then than they were in 1848, when the United States survey was made, or in 1852 or 1858 when the United States conveyed to this State? T. L. Davis testified that "there is sediment always forming, and after every overflow there is sediment found, and the land is gradually rising up." F. H. Varner testified that he has resided not far from this land ever since 1844 (four years before any survey was made) ; that low places, filled with water, are gradually filling up, but further than this the land has not been elevated. John M. Briggs testified that he does not think that the land has filled up or been elevated any at all; that the overflows wash out these low places, and prevent them filling; that nearly everywhere on what is known as "Sunk Lands" on top of the ground there is an ore-like substance in pieces as heavy as a pound to five pounds. This clearly indicates that the lands have not been materially elevated by sediment deposited on top of the ground. If it was, the ore would be covered. The preponderance of the evidence, we think, shows that the elevation of the "Sunk Lands" has not changed.

According to the opinion of the court in *Horne* v. *Smith,* 159 U. S. 40, and *Niles* v. *Cedar Point Club,* 175 U. S. 300, we do not think that the appellant acquired the lands in controversy by virtue of his riparian rights, or is the owner thereof, and so decide. Like the land in controversy in *Niles* v. *Cedar Point Club, supra,* they are low swampy lands, checked by bayous, subject to inundation, and reclaimable, to some extent, for agricultural purposes; and not such lands as can be acquired by virtue of riparian rights for fishing and other water purposes.

Appellant offered a letter of the Secretary of the Interior of the United States to the Commissioner of the General Land Office as evidence, and the court refused to receive or allow it to be read. The letter was a mere expression of opinion as to the lands in controversy. There was no contest before his department as to such lands which called for decision. There were no parties before him seeking for an adjudication. There were no issues to be

decided. No one interested had an opportunity to be heard. The letter was of no binding force or effect upon any one, and was properly excluded.

Decree affirmed.

McCULLOCH, J., dissents.