STATE BANK OF IOWA FALLS v. HAWKEYE GOLD DREDGING CO., Limited.

(Circuit Court of Appeals, Eighth Circuit. March 1, 1910.)

No. 2,848.

1. BANKS AND BANKING (§ 154*)—DEPOSITS—ACTION—LEGAL OR EQUITABLE REMEDY.

A corporation's remedy to recover from a bank money deposited therein in the name of the corporation's treasurer and alleged to have been wrongfully transferred by him to the bank by means of his checks as treasurer and converted by the bank is in equity and not at law; title to the deposit being in the treasurer and not in the corporation.

[Ed. Note.—For other cases, see Banks and Banking, Dec. Dig. § 154.*]

2. ESTOPPEL (§ 87*)—EQUITABLE ESTOPPEL—REPRESENTATIONS—RELIANCE ON.

B., who was plaintiff's secretary, having largely overdrawn his account with defendant bank, and being guilty of a defalcation of plaintiff's funds to the amount of $16,077.65, conveyed certain real estate to the bank for an expressed consideration of $19,000, subject to certain incumbrances; the deeds being in fact mortgages. On the same day B. executed to the bank a demand note for $16,077.65, which was entered on the bank's cashbook and on the bills receivable register as a bill receivable. On the same day B., as secretary, and M., as treasurer, of plaintiff corporation, signed and delivered to the bank a check for the same amount. After delivering the check, note, and deeds to the bank, a deposit slip was made out by the bank by which M.'s account as treasurer of plaintiff was credited with $16,077.65, and a passbook showing M.'s account as treasurer was written up by the bank showing such amount credited to his account. This account was shown to plaintiff's stockholders as so written up, and after a stockholders' meeting the bank charged the check against M.'s account as treasurer. From the time the check was delivered until it was so charged, it did not appear on the bank's books, nor did any one connected with plaintiff know of its existence, except B. and M. It also appeared that the bank would not have placed the amount to the credit of M., unless the check had been given. Held, that the transaction did not constitute a loan to any one, but was mere fraudulent bookkeeping to cover B.'s defalcation, and, there being no evidence that plaintiff acted or failed to act in reliance on such fictitious credit, the bank was not estopped to question its validity, nor could plaintiff recover the amount from the bank on the theory that it had been wrongfully transferred to the bank by the treasurer's checks.

[Ed. Note.—For other cases, see Estoppel, Dec. Dig. § 87.*]

Appeal from the Circuit Court of the United States for the Northern District of Iowa.

Suit by the Hawkeye Gold Dredging Company, Limited, against the State Bank of Iowa Falls. Judgment for plaintiff, and defendant appeals. Reversed and remanded, with directions to dismiss.

For opinion below, see 157 Fed. 253.

Robert Healy (Thos. D. Healy, Healy & Healy, F. M. Williams, and Parker, Hewitt & Wright, on the brief), for appellant.

Frank F. Dawley (W. L. Crissman, Albrook & Lundy, and Dawley & Wheeler, on the brief), for appellee.

Before HOOK and ADAMS, Circuit Judges, and CARLAND, District Judge.

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

CARLAND, District Judge. This action was brought by the dredging company, an alien corporation, against the bank, an Iowa corporation, for the purpose of having an accounting between the dredging company and the bank in regard to money deposited in the bank to the credit of H. C. Miller, Tr. H. G. D. Co., Ltd., during the year 1904, and for a decree against the bank for such sum as should on such accounting be found due the dredging company. The trial court on final hearing disallowed all the claims of the dredging company except an item of $16,077.65 for which it rendered judgment against the bank. The bank alone appeals. Hence our inquiry is limited to the question as to whether the court erred in its conclusion in respect to this item. The bank is located at Iowa Falls, Iowa. The dredging company, although a corporation of British Columbia, had its business office at the same place. In regard to the jurisdiction of the trial court over the matters in controversy, as a court of equity, we are satisfied with the views of the trial judge as expressed in his opinion, 157 Fed. 253. We now come to the consideration of the evidence upon which the trial court based its judgment.

The following facts in relation thereto are either undisputed or are clearly shown by the evidence: Byron B. Bliss was secretary, and H. C. Miller was treasurer, of the dredging company from its organization to September 24, 1904. The mode of handling the funds of the dredging company, so far as the bank was concerned, was as follows: If it was necessary to pay a debt of the dredging company, Bliss paid it by his own personal check on his account at the bank. In order to reimburse himself, he would make out a warrant as secretary of the dredging company on Miller, the treasurer, and Miller would give Bliss his check as treasurer on his account at the bank which was kept in the name of H. C. Miller, Tr. H. G. D. Co., Ltd. Four or five days prior to August 29, 1904, Miller made up the books of the dredging company and found Bliss indebted to it in the sum of $16,077.65. Miller insisted that Bliss pay this indebtedness. Bliss at this time also had overdrawn his account at the bank in the sum of $10,013.57. There was to be held and was held a meeting of the stockholders of the dredging company at Iowa Falls on August 30, 1904. On August 29, 1904, Bliss and his wife executed and delivered two deeds of conveyance to the bank, whereby for the total expressed consideration of $19,000 they conveyed to it 480 acres of land subject to incumbrances amounting to $8,500. These deeds, although absolute in form, were in fact mortgages. Just what they secured the payment of is one of the questions for consideration. On August 29, 1904, Bliss executed and delivered his promissory note payable on demand to the bank for $16,077.65, which was entered on the cashbook of the bank and also on the bills receivable register as a bill receivable. On the same day, and as part of the same transaction, Bliss and Miller signed and delivered to the bank the following check:

"No. 11,905.                                        Iowa Falls, Iowa, Aug. 29, 1904.

"Pay to the order of State Bank of Ia. Falls, $16,077.65 sixteen thousand and seventy-seven 65/100 dollars.                    Hawkeye Gold Dredging Co.,
                                                            "By B. B. Bliss, Sec.,
                                                            "H. C. Miller, Treas.

"To State Bank of Iowa Falls, Iowa Falls, Iowa."

After the deliverance of the check, the note, and the deeds to the bank, and on the same day, a deposit slip was made out by the bank, whereby the account of Miller as treasurer of the dredging company was credited with the sum of $16,077.65. On the same day a pass-book showing the account of Miller as treasurer of the dredging company was written up by the bank, and this credit to Miller's account appeared thereon. The account was shown to the stockholders of the dredging company as thus written up. On September 14, 1904, the bank, by the authority of the check above mentioned, charged the amount of the check against the account of Miller as treasurer of the dredging company. The check, from the time it was signed and delivered, nowhere appeared upon the books of the bank, nor did any one connected with the dredging company know of its existence except Bliss and Miller. The bank would not have placed the sum of $16,-077.65 to the credit of Miller, as treasurer of the dredging company, unless the check had been given. Bliss did not testify in this case. The reason for his not doing so is explained by the suggestion that some time in September, 1904, he became mentally unbalanced. Miller testified that the deeds herein mentioned were given to secure the repayment by Bliss of said sum of $16,077.65 which was a loan by the bank to Bliss in order that he might raise the money to square his account with the dredging company. He also testified that the words "Hawkeye Gold Dredging Company By" were not on the check above mentioned when he signed it and that he told Peet, the cashier, when he signed the check, that his name thereon would not make it worth one cent. There was expert testimony tending to show that the words mentioned had been written on the check after the signatures of Bliss and Miller had been written thereon. Evidence contradicting this testimony was introduced by the bank.

B. H. Thomas, the vice president of the bank, and who was in the active management of the same when the transaction in question occurred, testified: That on August 27, 1904, Bliss approached him in regard to obtaining a loan. That he told Bliss that, as he (Bliss) already had overdrawn his account at the bank in the sum of about $10,000, he could not expect to obtain any more money, but that if Bliss would secure the payment of the overdraft the bank would carry it for a time. That subsequently Bliss told Thomas that he did not want to borrow money for himself, but for the dredging company, which then had under consideration the building of a dredging machine, to be operated on the Fraser river in British Columbia. That if the dredging company decided to build or purchase such a machine it would want to borrow some money; otherwise not. That Thomas told Bliss that he (Bliss) had better find out first whether the dredging company desired to borrow some money, then, if the dredging company wanted to make a loan, the matter could be arranged. Bliss insisted, however, that the loan be made to the dredging company, and if it afterwards turned out that the dredging company did not want the money it could be returned. That as Miller, the treasurer of the dredging company, was going away from Iowa Falls for a period of six weeks, and would not be present to check back the money if the dredging company did not desire it, it was arranged between Thomas and

Bliss that the check should be given before Miller left, and delivered to the bank to be used if the dredging company did not finally want the money. That this arrangement was carried out as hereinbefore stated. That the promissory note of Bliss was taken as collateral security for the loan of $16,077.65 to the dredging company. That on September 14th Thomas met Bliss and asked him if the dredging company wanted the money. Bliss thereupon answered in the negative, and told Thomas that the amount of $16,077.65 might as well be charged against the account of the dredging company, which was, accordingly, done. That the deeds of conveyance were taken by the bank to secure the overdraft of Bliss. When the credit above mentioned was charged against the dredging company, the note of Bliss was also canceled, but the deeds were retained.

Upon the foregoing facts, the trial court found: That the transaction thus detailed was a loan to Bliss and not to the dredging company. That, by the credit given the dredging company on the books of the bank, the sum of $16,077.65 became the money of the dredging company, and that the same could not be again transferred to the bank by the check of Bliss and Miller, given without consideration. That the check was without authority, and this fact the bank knew.

If the liability of the bank was to be determined by the fact as to whether the transaction was a loan to Bliss or to the dredging company, there are strong reasons to support the finding of the trial court. The dredging company on the 29th day of August, 1904, had a cash balance to its credit in the bank of $26,000. The bank took no obligation from the dredging company except the check above mentioned, and the story to the effect that the dredging company wanted to borrow the exact amount of the indebtedness of Bliss to it in order to purchase or build a dredging machine, which according to the evidence would cost from $60,000 to $80,000, is incredible. The transaction, however, when looked square in the face, did not constitute a loan to any one. Called by its right name, it was simply false and fraudulent bookkeeping in order to cover up the defalcation of Bliss to the dredging company. When the bank at one and the same time gave the credit on its books to the dredging company and received the check of the dredging company for the same amount, it loaned no money to any one. So far as the matter of a loan was concerned, it made no difference whether the check was entered on the books of the bank or not. The check could be used at any moment should the dredging company attempt to use the credit, and it was so used. If the check had been given subsequent to the giving of the credit, and the credit had been a loan to the dredging company, there would be force in the contention that it was beyond the power of Miller and Bliss to give the money of the dredging company to the bank without consideration. But the case before us has not that element. The check was given before the credit went on the books of the bank, and the evidence warrants the finding that the credit would not have been given without it. This is not an action at law for deceit or for damages on account of false representation. It is suggested, however, that the bank is estopped from claiming the money in question by reason of having made the representation to the dredging company in regard to the balance stand-

ing to its credit. There might be some force in this position if there was any evidence in the record that the dredging company, relying upon the representation of the bank, acted, or failed to act, while the representation was in force, in such a manner as to lose its claim against Bliss. There is no evidence, however, that it did so act or fail to act. If the land conveyed to the bank was all the property Bliss had available for the payment of his debts, it had been conveyed to the bank before the representation was made. If Bliss had other property, it is not shown that he disposed of it between August 29th and September 14th.

In our opinion the facts as above stated do not warrant a judgment against the bank for the sum of $16,077.65, and the decree of the trial court is therefore reversed, and the cause remanded, with direction to dismiss the bill.