UNITED STATES v. LEE WILSON & CO.

(District Court, E. D. Arkansas, E. D. February 20, 1914.)

No. 283.

1. COURTS (§ 367*)—FEDERAL COURTS—AUTHORITY OF STATE DECISIONS.

The rule of property, established by decision in Arkansas, that a riparian owner on a nonnavigable lake owns to the center of the lake, is binding on the national courts.

[Ed. Note.—For other cases, see Courts, Cent. Dig. §§ 958, 959; Dec. Dig. § 367.*]

2. PUBLIC LANDS (§ 59*)—SURVEYS—BOUNDARIES—MEANDER LINES.

If there were no mistakes made in a survey of public lands, and a permanent body of nonnavigable water was properly meandered, the ownership of the meandered tract is controlled by the laws of the state as to riparian rights, which will be followed by the national courts; but if the surveyors were mistaken, or acted fraudulently, and there was at the time of the survey a large tract of land beyond the meander lines uncovered by a permanent body of water (exceptional dry seasons excepted), purchasers of the fractional tracts bounded by the meander lines are not entitled to the lands not included in the survey, the meander lines in that case constituting boundaries.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 184, 185; Dec. Dig. § 59.*]

3. PUBLIC LANDS (§ 96*)—PROCEEDINGS IN LAND OFFICE—AUTHORITY OF SECRETARY.

The Secretary of the Interior has power to inquire into and determine rights claimed in public lands until the legal title has passed out of the government.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 285–287; Dec. Dig. § 96.*]

4. PUBLIC LANDS (§ 59*)—SURVEY—IMPEACHMENT.

A nonnavigable lake, shown by a survey of public lands made in 1839 and 1840, surrounded by a meander line inclosing some 800 acres, held not to have existed as a permanent body of water at the time the survey was made, nor since that time, on evidence showing that the meander line as shown by the field notes would not close by three-fourths of a mile, that there is no perceptible difference in the level of the land on either side of such line, and that the tract is covered with trees, some of which are over a century old, and nearly all of species which will not grow on land permanently covered by water.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 184, 185; Dec. Dig. § 59.*]

5. PUBLIC LANDS (§ 59*)—PATENTS UNDER SWAMP LAND GRANT—LAND INCLUDED.

A patent to a state under the Swamp Land Grant Act of Sept. 28, 1850, c. 84, 9 Stat. 520, Rev. St. § 2479 et seq. (U. S. Comp. St. 1901, p. 1587), for the whole of a designated township of land, except section 16, "con-

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

taining 14,520.11 acres according to the official plats of survey,  * * *"
did not convey unsurveyed lands designated on such plats as lakes, al-
though erroneously separated from the surveyed land by meander lines,
and which were not included in the computed acreage.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 184, 185;
Dec. Dig. § 59.*]

6. PUBLIC LANDS (§ 59*)—PATENT—CONSTRUCTION—"PUBLIC LAND"—"PUBLIC
   DOMAIN."

The words "public land," or "public domain," as used in national legis-
lation, mean such lands as are subject to sale or other disposal under the
general land laws of the United States, and unsurveyed lands do not pass
by a patent issued under a grant of public lands.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 184, 185;
Dec. Dig. § 59.*

For other definitions, see Words and Phrases, vol. 6, pp. 5793–5795;
vol. 8, p. 7772; vol. 6, p. 5786.]

7. PUBLIC LANDS (§ 59*)—SWAMP LAND GRANT—TITLE OF STATE.

While the swamp land grant under Act Sept. 28, 1850, c. 84, 9 Stat. 520,
(U. S. Comp. St. 1901, p. 1587), is one in præsenti, the title of the state is
inchoate until the lands have been identified and patented; and unsur-
veyed lands, which have never been so identified or selected by the state,
although of the character covered by the grant, are, when surveyed, sub-
ject to other disposition by the United States.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 184, 185;
Dec. Dig. § 59.*]

8. PUBLIC LANDS (§ 59*)—SWAMP LAND GRANT—LANDS PASSING UNDER CON-
   FIRMATION ACT.

Act March 3, 1857, c. 177, 11 Stat. 251 (U. S. Comp. St. 1901, p. 1588),
confirming selections of swamp lands theretofore made and reported by
the states, so far as the lands remained vacant and unappropriated, did
not apply to lands which were at the time unsurveyed, and were there-
fore not subject to selection, although they were included within the
boundaries of a township, the remainder of which had been surveyed,
and had been selected, and was afterward patented to the state "accord-
ing to the official plats of the survey," the patent reciting the acreage
of the surveyed land; the acceptance of such patent being conclusive as
to the lands intended to be selected and conveyed.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 184, 185;
Dec. Dig. § 59.*]

9. PUBLIC LANDS (§ 61*)—SWAMP LAND ACT—ARKANSAS COMPROMISE ACT.

Act April 29, 1898, c. 229, § 3, 30 Stat. 368 (U. S. Comp. St. 1901, p.
1592), by which, as a part of a compromise between the United States
and the state of Arkansas, it was provided that the title of all persons
who had purchased any unconfirmed swamp land and held deeds for the
same was confirmed as against any claim of the United States, did not
inure to the benefit of a levee district, which was merely a political sub-
division of the state, and to which the state had made a grant of swamp
lands; but, on the contrary, such district was bound by a further provi-
sion of the compromise by which the state relinquished "all claims or de-
mands, adjusted or unadjusted," growing out of the Swamp Land Act or
the subsequent Confirmation Act.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 192–213;
Dec. Dig. § 61.*]

10. ESTOPPEL (§ 62*)—SWAMP LAND GRANT—SCOPE OF PATENT—EFFECT OF
    ENTRIES IN TRACT BOOKS.

Entries on the tract books of the Land Department that certain sec-
tions of land, parts of which were surveyed and parts unsurveyed, were

---

*For other cases see same topic & § NUMBER in Dec. & Am. Digs 1907 to date, & Rep'r Indexes

withdrawn from entry and sale, are not an admission that title to the entered sections had passed to the state as swamp lands under a patent to the surveyed parts, which would estop the United States from subsequently claiming the unsurveyed parts.

[Ed. Note.—For other cases, see Estoppel, Cent. Dig. §§ 151–153; Dec. Dig. § 62.*]

11. PUBLIC LANDS (§ 129*)—SUITS BY UNITED STATES—LIMITATION.
Act March 3, 1891, c. 561, § 8, 26 Stat. 1099 (U. S. Comp. St. 1901, p. 1521), which limits the time for the bringing of suits by the United States to vacate and annul patents to lands, does not apply to a suit to quiet title to land as public land of the United States, on the ground that no patent thereto has ever been issued and that the title has not passed out of the government.

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. § 345; Dec. Dig. § 129.*]

12. LIMITATION OF ACTIONS (§ 100*) — SUITS BY UNITED STATES — PUBLIC LANDS.
Such limitation does not begin to run against a suit based on fraud until the discovery of the fraud by the Interior Department, and knowledge acquired incidentally by a special agent of the Land Office cannot be attributed to the department.

[Ed. Note.—For other cases, see Limitation of Actions, Cent. Dig. §§ 323, 480–493; Dec. Dig. § 100.*]

13. PUBLIC LANDS (§ 61*)—SWAMP LAND GRANT—PROTECTION OF BONA FIDE PURCHASER.
A purchaser of lands patented to the state of Arkansas as swamp lands, who took deeds describing the lands according to the government survey and patent, which showed some of the subdivisions to be fractional, bounded by the meander line of a lake, was not a bona fide purchaser within the meander line, which was unsurveyed, so as to entitle him to protection under Compromise Act April 29, 1898, c. 229, § 3, 30 Stat. 368 (U. S. Comp. St. 1901, p. 1592).

[Ed. Note.—For other cases, see Public Lands, Cent. Dig. §§ 192–213; Dec. Dig. § 61.*]

14. ESTOPPEL (§ 62*)—ACTIONS BY UNITED STATES.
In a suit in equity to establish property rights, the United States is subject to the defense of estoppel to the same extent as a private litigant; but it cannot be estopped by the unauthorized or fraudulent acts of its agents or officers, or their mistakes.

[Ed. Note.—For other cases, see Estoppel, Cent. Dig. §§ 151–153; Dec. Dig. § 62.*]

15. ESTOPPEL (§ 52*)—EQUITABLE ESTOPPEL—ELEMENTS.
To cause an estoppel, the representations must have been made with full knowledge of the facts by the party to be estopped, unless his ignorance was the result of gross negligence, or otherwise involved gross culpability, and the party pleading the estoppel must have relied upon and been induced to act or to refrain from acting by such representations, to his injury if the other party is allowed to repudiate them.

[Ed. Note.—For other cases, see Estoppel, Cent. Dig. §§ 121–125, 127; Dec. Dig. § 52.*]

16. ESTOPPEL (§ 62*)—ACTIONS BY UNITED STATES.
Letters written by the Secretary and other officers of the Interior Department, giving opinions as to the rights of the United States in unsurveyed lands within the meander lines of lakes, as shown by the government survey and plats, the surrounding lands having been patented to

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

the state as swamp lands, the letters and the inquiries to which they were in answer all being based on the assumption that the meandered lakes were permanent bodies of water when the survey was made, *held* not to estop the government from claiming such lands on subsequent proof that they were not, when the survey was made, covered by permanent bodies of water, and that the survey was fraudulent or erroneous.

[Ed. Note.—For other cases, see Estoppel, Cent. Dig. §§ 151–153; Dec. Dig. § 62.*]

In Equity. Suit by the United States against Lee Wilson & Co., a corporation. On final hearing. Decree for the United States.

The United States, by its Attorney General, filed this bill to quiet its title to 853.60 acres of land described as follows: Lots 1, 2, 3, 4, 5, 6, 7, 8, and 9, the southeast quarter of the northwest quarter, southwest quarter of the northeast quarter, west one-half of the southeast quarter, and east one-half of the southwest quarter of section 22; lots 1, 2, 3, 4, 5, and 6, northwest quarter of the northeast quarter, northeast quarter of the northwest quarter, and the south one-half of the northeast quarter of section 27; and that fractional part of the west one-half of the northwest quarter of section 26, included within the survey approved April 28, 1910, all in township 12 north, range 9 east of the fifth principal meridian, in the county of Mississippi, state of Arkansas. There were several defendants who were supposed to make claim to these lands, but all filed disclaimers except Lee Wilson & Co., which is now the sole defendant.

The material allegations in the complaint are that these lands are a part of the public domain acquired by the Louisiana Purchase; that prior to the year 1910 they were wild, unoccupied, unappropriated, and unsurveyed; that they were surveyed by the government in 1910, and thereupon held subject to entry under the homestead laws, and such entries were made by various qualified persons in conformity with the laws of the United States and the rules and regulations of the General Land Office; that these persons entered upon these lands and are now in possession in privity with, but not adverse to, the paramount right of the government; that by an act of the General Assembly of the state of Arkansas, approved February 15, 1893 (Laws 1893, p. 24), and subsequent amendments, a certain section of the St. Francis basin in the state of Arkansas, and which includes these lands, was created as a political subdivision of the state as the St. Francis levee district; that until the year 1882 no attempt was made by the officers of the state to tax these lands, but that year they were assessed for taxes, and, the same not being paid, they were sold under the laws of the state of Arkansas; and the defendant deraigns title to these lands under and by virtue of such tax sale and deeds executed thereunder, and also under decrees of the chancery court of Mississippi county, where these lands are lying, in an attempt of the St. Francis levee board to have its title to said lands confirmed.

The bill then sets out defendant's claim of title, showing that: In 1859 the state of Arkansas purported to convey by its patent to W. B. Waldron section 22, the north one-half of the north one-half of section 26, and fractional section 27, township 12 north, range 9 east. Waldron's title was forfeited to the state for nonpayment of taxes. On March 27, 1885, the clerk of Mississippi county executed a deed to the state for these sections in pursuance of a decree of the court in what is called the "Overdue Tax Suit" rendered on February 23, 1883. The sale to the state was confirmed by the chancery court on July 22, 1884. In 1903 the state granted all its lands in Mississippi county to the St. Francis levee district. On December 12, 1894, the said chancery court, by its decree, confirmed title to said lands in the St. Francis levee district, and by certain mesne conveyances these lands were finally conveyed to the defendant. It is charged that all the conveyances under which defendant claims title to these lands are null and void; that the title to these lands never passed out of the United States, as they were un-

*For other cases see same topic & § NUMBER in Dec. & Am. Digs. 1907 to date, & Rep'r Indexes

surveyed lands, but that they are a cloud on the title of the government and the rights of the persons who have entered the lands as homesteads; that the defendant has harassed, intimidated, and interfered with these persons in the quiet possession of their homesteads, and threatens to continue to do so, and thereby prevent them from complying with the requirements of the homestead laws of the United States in respect to cultivation, improvements, and residence upon these lands.

The prayer of the bill is the usual one to cancel defendant's deed and evidence of claim of title, that plaintiff's title be quieted against the claim of defendant, and that the defendant be enjoined from molesting or in any wise interfering with the quiet and peaceable enjoyment of the lands by the persons claiming through plaintiff under the homestead laws.

It is unnecessary to set out the admissions and immaterial denials contained in the answer. The defenses upon which the defendant relies, and which were insisted on in the argument of the cause are, that these lands were by the government surveyed in 1841 as a part of its public domain; that in making said survey the township lines of the township were actually run, surveyed, located, established, and marked on the ground as provided by law, and that true and proper maps, plats, and field notes of said survey were returned to and filed in the General Land Office of the plaintiff at Washington, and were by the surveyor general duly accepted and approved as provided by law; that in the government survey of said township, made in 1841, the lines of the sections and of the subdivisions of sections were actually run, located, established, and marked on the ground as required by law; that at the time of said survey there existed in said township a small inland nonnavigable lake, known as "Moon Lake," which lake was meandered in the survey as provided by law, the meander lines being shown on the official plats of said survey to the General Land Office.

The answer then sets up the act of Congress of September 28, 1850 (9 Stat. 519, c. 84), known as the "Swamp Land Grant," and that the entire township was selected by the state of Arkansas as swamp land in 1852, and approved by the Secretary of the Interior on May 11, 1853; that in accordance with said approval the entire township was, on April 27, 1858, patented by the United States to the state of Arkansas, with the exception of section 16, which had theretofore been granted to the state as school lands; that this conveyance, it is claimed, passed the title to the entire township to the state of Arkansas; that the state conveyed these lands according to the plats and field notes of the survey of 1841, and that by mesne conveyances from the state of Arkansas the title to all of these lands is now in the defendant, which is the owner of all the lands in the three sections inside as well as outside of the meander lines of said lake as it appears in the original plats. It is charged that the state always claimed to be the owner of all of sections 22, 26, and 27 in that township, and that it assessed 640 acres in each of said sections for the years 1900 to 1910, inclusive, and these taxes were paid thereon by the defendant and those under whom it claims title; that the entire township was granted to the state of Arkansas by the Swamp Land Act of 1850 for the purpose of aiding it in the construction and maintenance of levees, to protect the lands in the district from overflow, and also to build drainage canals to reclaim the swamps and make them suitable for cultivation; that levees have been built and a drainage canal dug, and the defendant has been paying the taxes levied for these purposes; that by reason thereof the lands have increased in value; that the defendant purchased them in good faith, for a valuable consideration, believing that they had passed to the state and its grantees.

The answer also pleads the five-year statute of limitations under section 8 of the act of Congress of March 3, 1891 (26 Stat. 1099, c. 561), and an estoppel.

The bill was filed and process issued on August 4, 1911.

The following are the essential portions of the plats referred to in the opinion:

ORIGINAL SURVEY.

1910 SURVEY.

W. H. Martin, U. S. Atty., of Hot Springs, Ark., Willis N. Mills, of San Francisco, Cal., and J. A. Tellier, of Little Rock, Ark., Special Asst. Attys. Gen., for the United States.

Coleman & Lewis, of Little Rock, Ark., for defendant.

TRIEBER, District Judge (after stating the facts as above). It is undisputed that all the lands in that township were swamp and overflowed lands at the time of the enactment of the Swamp Land Act of September 28, 1850 (9 Stat. 519, c. 84), and continued as such until recently, when levees were built and a drainage canal dug; that the lands in controversy were resurveyed in 1910; that the field notes of the survey, made in 1839 and 1840 (although the parties speak of this survey as of 1841) were filed with the surveyor of public lands for Arkansas in 1841, and the plat made therefrom, which was approved in 1845, shows that these lands were described as a nonnavigable lake and meandered as such. But it is claimed on behalf of the plaintiff that, in fact, there was no lake or permanent body of water of any kind there at the time of the original survey and long before that time, and that the survey describing these lands as a lake was fraudulent; that the surveyor never ran any meander lines on the ground, but made them fraudulently, and, the lands being in fact unsurveyed lands, the title thereto never passed from the government; that by the compromise between the United States and the state of Arkansas, approved by Act Cong. April 29, 1898, c. 229, 30 Stat. 368, the state of Arkansas relinquished to the United States all adjusted or unadjusted claims under the Swamp Land Act of 1850 and that of 1857 not theretofore disposed of.

On the other hand, it is insisted that there was a nonnavigable lake or permanent body of water on these lands at the time the original survey was made. In order that the facts may be better understood, a copy of the original plat made from the field notes approved in 1845 is made an appendix to this opinion. From this plat it will be seen that, according to the field notes of the surveyor, there was at that time a lake as claimed by the defendant, and that it was properly meandered. It is therefore claimed that, the defendant being admittedly the owner of all the surveyed lands outside of the meander lines, it is, as the riparian owner, under the laws of the state of Arkansas as construed by the highest court of that state, entitled to the lands described as a "lake," which are the lands now in controversy.

[1] Under the laws of this state the riparian owner on a nonnavigable body of water is the owner to the center of the lake. Railway Company v. Ramsey, 53 Ark. 314, 13 S. W. 931, 8 L. R. A. 559, 22 Am. St. Rep. 195; Chapman & Dewey Land Co. v. Bigelow, 77 Ark. 338, 92 S. W. 534; Rhodes v. Cissel, 82 Ark. 367, 101 S. W. 758; Glasscock v. National Box Co., 104 Ark. 154, 148 S. W. 248; Harrison v. Fite, 148 Fed. 781, 783, 78 C. C. A. 447, a case involving similar lands in the state of Arkansas. A rule of property thus established by the highest court of the state is binding on the national courts. Hardin v. Jordan, 140 U. S. 371, 11 Sup. Ct. 808,

838, 35 L. Ed. 428; Hardin v. Shedd, 190 U. S. 508, 23 Sup. Ct. 685, 47 L. Ed. 1156; Kean v. Calumet Canal Co., 190 U. S. 452, 23 Sup. Ct. 651, 47 L. Ed. 1134.

[2] But it is equally well settled by the decisions of the Supreme Court of the United States that the making of a meander line has no certain significance. French-Glenn Live Stock Co. v. Springer, 185 U. S. 47, 52, 22 Sup. Ct. 563, 46 L. Ed. 800. "It does not necessarily import that the tract on the other side of the meander lines is not surveyed or will not pass by a conveyance of the upland shown by the plat to border on the lake. It is not always a boundary." Kean v. Calumet Canal Co. supra. Nor does it follow that a patent for the surveyed lands adjoining carries with it the lands inside the meander lines. Horne v. Smith, 159 U. S. 40, 45, 15 Sup. Ct. 988, 40 L. Ed. 68; Niles v. Cedar Point Club, 85 Fed. 45, 29 C. C. A. 5, affirmed in 175 U. S. 300, 20 Sup. Ct. 124, 44 L. Ed. 171; Hardin v. Jordan, supra.

Evidence showing that the meander line was not at or near the water would make it a boundary, and that regardless of whether the running of the water line was a mere oversight or whether the surveyors were of the opinion that the action of the water would soon wash the lowlands away. Security Land & Exp. Co. v. Burns, 193 U. S. 167, 186, 187, 24 Sup. Ct. 425, 48 L. Ed. 662. In Horne v. Smith, supra, it was held:

"Although it was unsurveyed, it does not follow that a patent for the surveyed tract adjoining carries with it the land which perhaps ought to have been, but which was not in fact, surveyed. The patent conveys only the land which is surveyed, and when it is clear from the plat and the surveys that the tract surveyed terminated at a particular body of water, the patent carries no land beyond it." 159 U. S. 45, 15 Sup. Ct. 990, 40 L. Ed. 68.

If no survey was in fact made, or no meander line in fact run, or if no body of water in fact existed near the alleged meander line, the government cannot be estopped by the fact that the field notes and plat made therefrom show the existence of a lake. Kirwan v. Murphy, 189 U. S. 35, 53, 54, 23 Sup. Ct. 599, 603 (47 L. Ed. 698). In that case it was held:

"The Land Department must necessarily consider and determine what are public lands, what lands have been surveyed, what are to be surveyed, what have been disposed of, what remain to be disposed of, and what are reserved. * * * The administration of the public lands is vested in the Land Department, and its power in that regard cannot be divested by the fraudulent action of a subordinate officer, outside of his authority, and in violation of the statute. Whiteside v. United States, 93 U. S. 247 [23 L. Ed. 882]; Moffat v. United States, 112 U. S. 24 [5 Sup. Ct. 10, 28 L. Ed. 623]; Hume v. United States, 132 U. S. 406, 414 [10 Sup. Ct. 134, 33 L. Ed. 393]. The courts can neither correct nor make surveys. The power to do so is reposed in the political department of the government, and the Land Department, charged with the duty of surveying the public domain, must primarily determine what are public lands subject to survey and disposal under the public land laws. Possessed of the power, in general, its exercise of jurisdiction cannot be questioned by the courts before it has taken final action. Brown v. Hitchcock, 173 U. S. 473 [19 Sup. Ct. 485, 43 L. Ed. 772]."

To the same effect are the late decisions in Little v. Williams, 88 Ark. 37, 113 S. W. 340, affirmed in 231 U. S. 335, 34 Sup. Ct. 68,

58 L. Ed. 256; Chapman & Dewey Lumber Co. v. St. Francis Levee District, 232 U. S. 186, 34 Sup. Ct. 297, 58 L. Ed. —— (opinion delivered January 26, 1914).

The rules of law as established by the numerous decisions of the Supreme Court on that subject may be epitomized as follows: If there were no mistakes made in the survey, and a permanent body of nonnavigable water was properly meandered, the ownership of the meandered tract is controlled by the laws of the state in which the lands are situated, and if they hold that such an owner is entitled to claim ownership to the center of the lake, the national courts will follow that rule. If, on the other hand, the surveyors were mistaken or acted fraudulently, and there was at the time of the survey a large tract of land beyond the meander lines, uncovered by permanent bodies of water (exceptional dry seasons of course excepted), purchasers of the fractional tracts bounded by the meander lines are not entitled to the land not included in the survey; the meander lines constituting, in that case, boundaries.

The Secretary of the Interior in 1908, after a hearing upon notice, at which many parties, some of them squatters who wanted to acquire them as homesteads, others claimants as riparian owners, such as the defendant in this case claims to be, and also representatives of the St. Francis levee district, were present and heard, ordered a survey of these meandered lands in order that they might be brought under the operation of the laws governing the disposal of like public lands. Arkansas Sunk Lands, 37 Land Dec. Dep. Int. 345. The Secretary made a finding that these lands were not covered by any permanent body of water at the time of the original survey, or at the time of the enactment of the Swamp Land Act, or when the state made its selection. He further found:

"It seems clear from what is now before the department that a permanent body of water did not occupy these lands at the time of the public survey, and that, except as to a portion shown to be high and dry upland, sometimes referred to as highlands, the great body of the land was swamp and overflowed lands both at the date of the public survey and the passage of the swamp land grant of 1850."

This was adhered to on an application for a rehearing had in 1909. 37 Land Dec. Dep. Int. 462.

[3] That the Secretary of the Interior has the power to inquire into the extent and validity of the rights claimed against the government until the legal title has passed is undoubted. Michigan Land & Lumber Co. v. Rust, 168 U. S. 589, 593, 18 Sup. Ct. 208, 42 L. Ed. 591, and authorities there cited. A survey was accordingly made in 1910. This last survey shows the land in controversy, as will be seen from a copy of the plat filed with this opinion.

Assuming, as is claimed by counsel for the defendant, that this finding of the Secretary is not conclusive, there is some contention as to whether it is even prima facie evidence of the facts found. On the part of the defendant it is claimed that the original survey is prima facie correct and the burden of proof is upon the plaintiff to overthrow this presumption, regardless of the findings made by the

Secretary of the Interior. On the other hand, the contention of the plaintiff is that the prima facie presumption of the original survey has been overcome by the resurvey of 1910 ordered to be made by the Secretary of the Interior after a hearing, and that the burden of proof to show that this land was in fact a lake is upon the defendant, and in support of this contention they cite Knight v. United States Land Ass'n, 142 U. S. 161, 12 Sup. Ct. 258, 35 L. Ed. 974; Cragin v. Powell, 128 U. S. 691, 9 Sup. Ct. 203, 32 L. Ed. 566; Tubbs v. Wilhoit, 138 U. S. 134, 11 Sup. Ct. 279, 34 L. Ed. 887; Michigan Land & Lumber Co. v. Rust, supra; Johnson v. Elder, 92 Ark. 32, 40, 121 S. W. 1066.

[4] But the evidence in this case, although very voluminous, each side having introduced a great number of witnesses, is of such a nature that it is wholly immaterial what presumption should be indulged in. The oral testimony is by witnesses who have known something about the land only within the last 30 or 40 years, many of them for a much shorter period. Not a single witness was familiar with the land when the original survey was made. For this reason most of the testimony is either hearsay or opinion evidence. That is conflicting, although the court finds that the preponderance is strongly in favor of the government that these lands were not submerged lands, nor was there a lake there at the time of the survey. The evidence of the topography of this area shows conclusively that no lake or permanent body of water could possibly have been there within the last 100 years or more. It is undisputed and admitted by the defendant that there is no evidence whatever to show that there was a retaining bank or shore line at or near the east meander line. While there is some testimony that there is a retaining bank where the meander line on the west side has been marked in the original survey, the great weight of the evidence is that that line is that of Plum Bayou, that the nearest point is several hundred yards from the meander line, and as it runs south it is farther away from it. Moon Lake, or Half Moon Lake, as it is called by some of the witnesses, which it is claimed is the meandered lake, is, in fact, a small body of water near the west meander line, a mere pond, which at no time exceeded one acre; its banks were well defined, and it is surrounded by a growth of timber, which could not have grown in a permanent body of water. There is also a small body of water near the east meander line, but this covered only a few yards, not large enough to be dignified as a pond, and may properly be designated as what is known in that section as a "hog wallow." It establishes beyond a doubt that no depression can be noticed in the meandered area; that there is no appreciable difference in the elevation between the lands on the two sides of the meander lines. The lines of levels show an elevation of 232.2 at the east meander line, and continuing west it never gets below this, and at the west line it is 233.4. The highest elevation is 235, and is within the interior boundaries of the area marked. "lake."

It is also shown by the undisputed evidence, and the many photographs taken and filed as exhibits to the testimony, that there is a

heavy growth of large living trees, which could not possibly have grown on submerged lands. Many of them, as shown by the testimony of Dr. Henry C. Cowells, of the University of Chicago, one of the most eminent ecologists in this country, and also by the testimony of an employé of the Forestry Bureau of the Department of Agriculture, who has had many years' experience, are over 70 and some over 200 years old. These trees are oaks, hackberry, maple, hickory, ash, and red gum. None of these trees, it is shown, could possibly have grown on lands covered for any length of time with water. There are also a number of old cypress trees found in the cypress brakes in this area, and while cypress will live in water under certain conditions, it is shown that they will die if submerged above the swell or buttressed base.

Mr. Janes, also an experienced ecologist, testified that he examined all the timber for a distance of 33 feet on each side of the meander lines, counted the trees, and obtained their diameters; that there was no difference in the lands on either side of the meander lines; that he found the area in dispute to be a forest of many hardwood trees and some cypress trees of various ages and size. He found in the area numerous small mounds of earth, indicating that at that particular point trees of considerable size formerly grew, and were windthrown a long time ago; and at other places he found small depressions where trees had stood and the stumps burned out, which must have been on the land long before 1839. The percentage of trees he found to be as follows: Ash, 49 per cent.; locust, 15.06 per cent.; cypress, 12.07 per cent.; hackberry, 11.26 per cent.; elm, 9.31 per cent.; oak, 7.24 per cent.; maple, 2.30 per cent.; persimmon, 1.49 per cent.; hickory, 1.03 per cent. He counted and examined all the trees on 25½ acres of this land, which strip he testified was a fair average of the entire area. There were 870 trees on that strip, and he found the diameter of these, in inches, as follows: 25.73 per cent., 12 inches; 16.67 per cent., 14 inches; 11.01 per cent., 16 inches; 9.84 per cent., 18 inches; 10.04 per cent., 20 inches; 3.61 per cent., 22 inches; 3.51 per cent., 24 inches; 5.75 per cent., 26 inches; 4.38 per cent., 28 inches; 4.87 per cent., 30 inches; 1.27 per cent., 32 inches; 1.07 per cent., 34 inches; 1.36 per cent., 36 inches; .88 per cent., 38 inches.

The testimony also establishes the fact that according to the original survey of 1839 and 1840 the meander lines of that township were three-fourths of a mile short and therefore could not be closed. This was shown, not only by the testimony of plaintiff's witnesses, but also by that of Mr. Payne, an assistant chief of the surveying division of the General Land Office, who was a witness on behalf of the defendant. From his testimony it appears that this survey was evidently never examined by the Land Office and never checked up at all; otherwise, the incorrectness of the survey would necessarily have been discovered. His testimony on that point, after testifying to the incorrectness of the original survey, is:

"The presumption from the fact that there was a failure to close the lines is, on the face of it, that there was an incorrect survey, and that it was not

examined by this office, and not checked up at all. Q. So that whatever discrepancy or inaccuracy fatal to the integrity of that survey, which might have appeared, may have remained undisclosed until about the year 1910? A. Yes, sir. Q. And for the period of 70 years that alleged survey of the meander line of that unsurveyed area showed on its face in the office that it couldn't close by three-fourths of a mile, and if examined at any time during these 70 years the error would have been discovered? A. Yes, sir."

Without detailing all the testimony, the court is convinced beyond a reasonable doubt that there was no permanent body of water on the land meandered at the time the original survey was made, nor for a long period before that time, nor at the time of the passage of the act of 1850, nor at the time the state made its selection. In the opinion of the court, no meander lines were actually traced by the surveyor. The most charitable view to take is that, the survey having been made in December and January, usually the rainy season in that section, the surveyor found a great deal of water on it, and to save himself the inconvenience of making an actual survey of that wet ground he put it in his field notes as a lake.

### Unsurveyed Lands of the Government.

[5] Does the fact that the patent to the state of Arkansas, under the Swamp Land Act of 1850, conveys "the whole of township 12 north, range 9 east" (except section 16), include the unsurveyed lands claimed by the defendant? The state, in its selection, asked for the whole township, "containing 15,003.97 acres." That covered all the surveyed lands in the township as shown by the plat, and did not include any unsurveyed lands. Had there been no meandered tracts, the township would have contained 23,040 acres. The patent of the government is as follows:

"Township twelve north of range nine east; the whole of the township, except section sixteen, containing 14,526.11 acres according to the official plats of survey of the said lands returned to the General Land Office by the surveyor general."

Section 16, excepted from this grant, and which is represented on the plats as containing 438.94 acres, had theretofore been granted to the state for school purposes, and therefore could not again be conveyed under the Swamp Land Act. Deducting this from all the surveyed lands, it would leave 14,526.11. The difference of 39.92 acres between what the state selected and what was granted was probably caused by a mistake of the state officials in adding the acreage of the lands surveyed in the different sections, of which so many were fractional.

[6] The words "public lands" mean such lands as are subject to sale or other disposal under the laws of the United States. Newhall v. Sanger, 92 U. S. 761, 763, 23 L. Ed. 769; Leavenworth, etc., R. R. Co. v. United States, 92 U. S. 733, 741, 23 L. Ed. 634; Bardon v. Northern Pacific R. R. Co., 145 U. S. 535, 538, 12 Sup. Ct. 856, 36 L. Ed. 806; Barker v. Harvey, 181 U. S. 481, 490, 21 Sup. Ct.

214 F.—41

690, 45 L. Ed. 963; Minnesota v. Hitchcock, 185 U. S. 373, 391, 22 Sup. Ct. 650, 46 L. Ed. 954. In Barker v. Harvey, the court said:

"'Public domain' is equivalent to 'public lands,' and these words have acquired a settled meaning in the legislation of this country."

And in Bardon v. Northern Pacific R. R. Co., it was held:

"The grant is of alternate sections of public land, and by public land, as it has long been settled, is meant such land as is open to sale or other disposition under general laws."

Unsurveyed lands could, therefore, not be subject to a grant under the act of 1850 and similar acts, as they were not "public lands." Horne v. Smith, 159 U. S. 40, 45, 15 Sup. Ct. 988, 40 L. Ed. 68; United States v. Curtner (C. C.) 38 Fed. 1, 9, 10; Sawyer v. Gray (D. C.) 205 Fed. 160, 163, where the court held:

"The government survey creates, not merely identifies, sections of land."

In Little v. Williams, 88 Ark. 37, 52, 113 S. W. 340, 344, affirmed in 231 U. S. 335, 34 Sup. Ct. 68, 58 L. Ed. 256, it was held by the Supreme Court of Arkansas, in construing the effect of a similar description in another patent to the state for lands acquired under the act of 1850, that:

"Descriptions of lands, according to terminology employed in the system of governmental surveys and plats of lands, is necessarily a reference to the plats of those surveys; for those terms are meaningless unless so considered with reference to the surveys and plats. There is nothing known of townships, sections, and part of sections of lands, except such as are described in the plats of the government surveys. Therefore, giving the word 'township,' used in the stipulation of facts, the meaning which we must attribute to the parties who employed the term, it has reference to the townships surveyed and platted by the government surveyors, and means the townships according to the surveys and plats. A conveyance of the township 'according to plat of the survey' does not include lands which do not appear on the plat of the surveys. We do not mean to hold that the unsurveyed land could not have been selected as swamp lands and patented to the state by the use of proper descriptive terms in the patent; but this was not accomplished by reference to townships, sections, or parts thereof according to the plat of the surveys, when the unsurveyed land did not appear on the plats at all. The plats showed it to be water, and not land."

In affirming this case Mr. Justice Van Devanter said:

"The unsurveyed land within the meander line was never selected by the state, or listed by the Secretary of the Interior, as swamp or overflowed land; nor was it ever patented to the state."

In Chapman & Dewey Lumber Co. v. St. Francis Levee District, supra, in which the same question was before the Supreme Court of the United States, the patent to the state being for all of the township, except section 16, containing 14,329.97 acres, Mr. Justice Van Devanter, speaking for the court, said:

"Of course, the words in the patent, 'the whole of the township, * * *' are comprehensive; but they are only one element in the description, and must be read in the light of the others. The explanatory words, 'according to the official plats of survey of said lands, returned to the General Land Office by the surveyor general,' constitute another element, and a very important one; for it is a familiar rule that, where lands are patented according

to such a plat, the notes, lines, landmarks, and other particulars appearing thereon become as much a part of the patent, and are as much to be considered in determining what it intended to include, as if they were set forth in the patent. Cragin v. Powell, 128 U. S. 691, 696 [9 Sup. Ct. 203, 32 L. Ed. 566], Jefferis v. East Omaha Land Co., 134 U. S. 178, 194 [10 Sup. Ct. 518, 33 L. Ed. 872]. The specification of the acreage is still another element; and, while of less influence than either of the others, it is yet an aid in ascertaining what was intended; for a purpose to convey upwards of 22,000 acres is hardly consistent with a specification of 13,815.67. Ainsa v. United States, 161 U. S. 208, 229 [16 Sup Ct. 544, 40 L. Ed 673]; Security Land Company v. Burns, supra; 3 Washburn on Real Prop. (5th Ed.) 127. Giving to each of these elements its appropriate influence, and bearing in mind that the terms of description are all such as are usually employed in designating surveyed lands, we are of opinion that the purpose was to patent the whole of the lands surveyed, except fractional section 16, and not the areas meandered and returned, as shown upon the plat, as bodies of water. * * * As, then, the lands in controversy were not included in the patent, and, under the findings below, did not pass to the state or to the defendants by riparian right with the adjoining fractional sections and subdivisions, it follows that they remain the property of the United States. Niles v. Cedar Point Club, supra; French Live Stock Co. v. Springer, supra; Security Land Co. v. Burns, supra."

This is conclusive on this court.

[7] It is true, as claimed by the defendant, that the swamp land grant is in præsenti, and passed title to such lands of its date September 28, 1850. As stated by Mr. Justice Field in Wright v. Roseberry, 121 U. S. 488, 509, 7 Sup. Ct. 985, 30 L. Ed. 1039, after a review of all former decisions on that subject:

"The result of these decisions is that the grant of 1850 is one in præsenti, passing the title to the lands as of its date, but requiring identification of the lands to render the title perfect; that the action of the Secretary in identifying them is conclusive against collateral attack, as the judgment of a special tribunal to which the determination of the matter is intrusted; but, when that officer has neglected or failed to make the identification, it is competent for the grantees of the state, to prevent their rights from being defeated, to identify the lands in any other appropriate mode which will effect that object. A resort to such mode of identification would also seem to be permissible, where the Secretary declares his inability to certify the lands to the state for any cause other than a consideration of their character."

In Chapman & Dewey Lumber Co. v. St. Francis Levee District, supra, it was also contended that the title to the lands in controversy, even though not included in the patent, passed to the state under the Swamp Land Act independent of any patent; but this contention was held by Mr. Justice Van Devanter to be untenable, the court holding:

"The lands were never listed as swamp lands, and their listing does not appear to have been even requested, doubtless because they were not surveyed."

In Little v. Williams, supra, the court quotes with approval from Rogers Locomotive Works v. Emigrant Co., 164 U. S. 559, 17 Sup. Ct. 188, 41 L. Ed. 552, the following:

"While, therefore, as held in many cases, the act of 1850 was in præsenti, and gave an inchoate title, the lands needed to be identified as lands that passed under the act; which being done, and not before, the title becomes perfect as of the date of the granting act."

And again (164 U. S. 574, 17 Sup. Ct. 192, 41 L. Ed. 552):

"It belonged to him [the Secretary of the Interior], primarily, to identify all lands that were to go to the state under the act of 1850. When he made such identification, then, and not before, the state was entitled to a patent, and 'on such patent' the fee simple title vested in the state. The state's title was at the outset an inchoate one, and did not become perfect, as of the date of the act, until a patent was issued."

## Confirmation Acts of Congress.

[8] It is next claimed on behalf of the defendant that, even if there was no permanent body of water there at the time of the original survey, as all the lands in that township were in fact swamp and overflowed lands in 1850, and were so at the time the state made its selection, which was filed in the General Land Office, on September 22, 1852, and approved by the Secretary of the Interior on May 11, 1853, the Confirmation Act of March 3, 1857, c. 177, 11 Stat. 251, vested the title to the entire township in the state at once, even if no patent had ever been issued by the government. It is also claimed that by section 3 of the act of April 29, 1898 (30 Stat. 368, c. 229 [U. S. Comp. St. 1901, p. 1592]) known as the "Arkansas Compromise Act," the title to these lands was confirmed to the defendant. The act of 1857 declared:

"That the selection of swamp and overflowed lands granted to the several states by the act of Congress approved September 28, 1850, * * * and heretofore made and reported to the Commissioner of the General Land Office, so far as the same shall remain vacant and unappropriated, and not interfered with by an actual settlement under any existing laws of the United States, be and the same are hereby confirmed, and shall be approved and patented to the said several states, in conformity with the provisions of the act aforesaid, as soon as may be practicable after the passage of this law."

Then follows a proviso which is immaterial as to the issues involved in the instant case.

The patent to the state, which was issued in 1858, it is contended, could not derogate from nor limit the extent of the title of this area which had already passed to the state by the act of 1857. Martin v. Marks, 97 U. S. 346, 24 L. Ed. 940, is relied on as conclusive of this claim. In that case Mr. Justice Miller, speaking for the court, declared the intention of the lawmakers in enacting the act of 1857 to have been:

"It seems that, seven years after the passage of the swamp land grant, this failure of the Secretary to act had become a grievance, for which Congress deemed it necessary to provide a remedy, by the act of March 3, 1857."

The report of the case does not show what kind of lands were there involved, whether surveyed or unsurveyed, meandered or not, dry or submerged; nor does the opinion of the Supreme Court of Louisiana (reported in 27 La. Ann. 527), from which court the cause was removed by writ of error to the Supreme Court of the United States, show the nature of the lands involved. In order to ascertain the exact facts in that case the court procured a copy of the original record. This shows that the land in controversy in that case was surveyed

land, was free from water, was not fractional or bordering on a water course, was platted as the "southeast quarter of section seven, in township twenty, of range fourteen, containing 160 acres," had been selected as swamp land by the state of Louisiana, and approved by the General Land Office prior to the enactment of the Confirmation Act of 1857, and sold by the state to one under whom the plaintiff Marks claimed title. For some reason the land had not been withdrawn from entry by the government. Thereupon the defendant Martin entered it under the homestead laws, and received a patent therefor from the United States, dated May 20, 1873. As the facts in that case were different entirely from those shown to exist in the instant case, it is of course, inapplicable, and cannot be considered as an authority for any of the issues herein. involved.

If the lands in controversy were unsurveyed, and this is undisputed, then, as hereinbefore shown, they were not "public lands" within the meaning of the act of 1850, and until surveyed did not pass by the grant, nor could they be selected. If there was no grant to the state, there was nothing to confirm. The selection by the state, as shown by the recitals of the patent, were "according to the official plats of survey of the said lands returned to the General Land Office by the surveyor general," giving the acreage of the surveyed lands. The patent to the state is "according to the official plats of survey, containing 14,526.11 acres." In Kirby v. Lewis (C. C.) 39 Fed. 66, 70, Judge Caldwell held:

"The recitals in a deed constitute a part of the title. It is as much a muniment of title as any covenant therein running with the land. * * * The acceptance of a deed by a grantee makes its recitals evidence against him, * * * and parol evidence is inadmissible to contradict or vary material recitals. Whenever the recitals of a patent nullify its granting clause, the grant fails"—citing Penrose v. Griffith, 4 Bin. (Pa.) 231; Improvement Co. v. McCreary, 58 Pa. 304; Smelting Co. v. Kemp, 104 U. S. 636, 644, 26 L. Ed. 875.

[9] Nor does the Compromise Act of 1898 aid the defendant in any way. On the contrary, whatever claim the state had to these lands was relinquished by that compromise. The compromise was made in 1895, approved, with the amendments proposed by Congress, by the General Assembly of the state of Arkansas on March 10, 1897 (Session Acts of Arkansas 1897, p. 89), and for the United States by the act of Congress of April 29, 1898. Section 3 of the act of Congress, upon which defendant relies, provides:

"That the title of all persons who have purchased from the state of Arkansas any unconfirmed swamp land *and hold deeds for the same* be, and the same is hereby, confirmed and made valid as against any claim or right of the United States, and without the payment by said persons, their heirs or assigns, of any sum whatever to the United States or to the state of Arkansas."

The compromise made by the United States and the state of Arkansas provided for a surrender by the government to the state of its bonds, amounting, with the interest, to a very large sum of money, and

as a consideration for the surrender of these bonds the state relinquished and quitclaimed to the United States—

"all claims or demands, adjusted or unadjusted, growing out of the act of September 28, 1850, known as the Swamp Land Act, the acts of March 2, 1855, and March 3, 1857, or any other act."

It will thus be seen that the relinquishment of the claims on the part of the state to the swamp lands granted by the act of 1850, as well as the Confirmation Act of 1857, or any other act, was for a valuable consideration. When that compromise was concluded and approved by the state of Arkansas and the act of Congress of 1898, the state, not only for itself, but for all its subordinate political subdivisions and subordinate agencies, of which the St. Francis levee district was one, relinquished all claims they or it may have had to any lands undisposed of. This was authoritatively settled by the Supreme Court in Little v. Williams, supra. Mr. Justice Van Devanter, delivering the opinion of the court in that case, said:

"Assuming that the inchoate title [of the state] had then passed to the levee district under the act of 1893, was the district in any better situation than the state? The answer turns upon the relation of the one to the other. The district was a mere political subdivision of the state. * * * It was essentially a subordinate agency of the state, was exercising a power of the state for its convenience, could have no will contrary to the will of the state, held its property and revenue for public purposes, and was in all respects subject to the state's paramount authority. In view of this relation, we are quite clear that the state's action was binding upon the district, and that the latter could not by its subsequent deed to the plaintiff invest her with a title which it no longer possessed."

This was reaffirmed in Chapman & Dewey Lumber Co. v. St. Francis Levee District, supra.

As none of these lands were conveyed by the levee district, under whom the defendant now claims title, until after the enactment of the act of 1898, nothing passed to the defendant under these conveyances.

As to the state's patent to Waldron, it is sufficient to say that, if there was no lake or permanent body of water there, then the state's patent to Waldron did not convey any lands beyond the meander lines, even if an inchoate equitable title to these lands had passed to the state under the Swamp Land Act of 1850 and the Confirmation Act of 1857. If still in the state, or its political subdivisions, they were quitclaimed to the government by the compromise of 1898. But even if these lands had passed to Waldron by the state's patent, as they were forfeited to and again became the property of the state, and the defendant makes no claim except through the St. Francis levee district, it cannot claim to hold under the Waldron patents, which had been, in effect, relinquished to the state by the forfeiture.

Aside from that, the state did not by its patents to Waldron attempt to convey any of these unsurveyed lands nor did it do so. The lands it conveyed were described in the patent as follows:

"Fractional section twenty-two, township twelve north, range nine east, containing 164.07 acres."

Section 26 is conveyed in one patent with sections 25, 34, and 35 of that township, and is described:

"Section twenty-six, township twelve north, range nine east."

There is no separate description of the acreage of each section, but the four sections are stated to contain "2,543.83 acres, as shown by the plat of the original survey." Sections 25, 34, and 35 were full sections of 640 acres each; section 26 being the only fractional section conveyed by that patent. As will be seen from an inspection of the original plat, the meandered lake covers only a very small, irregular part of section 26, which accounts for the shortage of only 16.17 acres. In the survey of 1910 this small tract was found to contain 17.80 acres. This slight difference was probably caused by a less accurate survey in 1840. The patent of the state for section 27 included also the north half of section 36, and describes the lands conveyed as:

"North half of section thirty-six, and fractional section twenty-seven, township twelve north, range nine east, containing, in the aggregate, 613 acres."

The north half of section 36 contains 320 acres, leaving the acreage of fractional section 27 293 acres, the exact amount of the surveyed lands of that section, thus showing that the state made no claim to any of the unsurveyed lands, and made no attempt to convey them to Waldron. The consideration paid the state by Waldron was 50 cents an acre for the surveyed lands.

[10] Nor is the contention that the entries on the government tract books at Washington and Little Rock that the whole of sections 22, 26, and 27 had been withdrawn from further entry and sale are an admission on the part of the government that the entire sections of 640 acres each, surveyed and unsurveyed, had been selected and patented as swamp lands under the act of 1850, tenable. These entries only meant that all of the lands in those sections which were "subject to disposal" had been granted to the state, and were, therefore, no longer subject to entry or sale. As unsurveyed lands never were subject to entry or sale, there was nothing to be withdrawn.

By section 4 of the act of 1898, the state of Arkansas—

"relinquished and quitclaimed to the United States all lands heretofore confirmed, certified or patented to the state, which have been entered under the public land laws; and does hereby cede, relinquish and quitclaim to the United States all right, title and interest under the acts of September 28, 1850, March 2, 1855, and March 3, 1857, in and to all lands in the state which have been heretofore granted, confirmed, certified or patented by the United States under any other acts, and the title to such lands is hereby confirmed in the grantees, their heirs, successors or assigns, anything in this act or any other act to the contrary notwithstanding."

After that act had been passed, having been approved by the state in 1897, as shown by the act of Congress, which recites that fact, the levee district had no more title to these lands than if the Swamp Land Act had never been passed, and, of course, it could thereafter convey no title.

### The Statute of Limitations.

[11] The defendant invokes the statute of limitations of section 8 of Act March 3, 1891, c. 561, 26 Stat. 1099 (U. S. Comp. St. 1901, p. 1521). That act, in so far as it applies to this plea, reads:

"That suits by the United States to vacate and annul any patent heretofore issued shall only be brought within five years from the passage of this act, and suits to vacate and annul patents hereafter issued shall only be brought within six years after the date of the issuance of such patents."

Complete answers to this plea are:

1. That this is not an action to vacate or annul a patent heretofore granted by the government. The claim of the government is based solely on the fact that these lands, being unsurveyed, were not and could not have been selected by the state, and no patent had ever issued for them. Therefore, it is claimed, the title thereto had never passed out of the government. United States v. Chandler-Dunbar Water Power Co., 209 U. S. 447, 28 Sup. Ct. 579, 52 L. Ed. 881, earnestly relied on by counsel for the defendant, is based upon a state of facts entirely different from those established in this case, and, therefore, inapplicable. It was there held that the islands in controversy had passed to the state of Michigan upon its admission as a state by reason of being in a navigable stream, and if they had belonged to the United States they would have passed as neglected fragments. These islands, the court found—

"are little more than rocks, rising very slightly above the level of the water, and contained, respectively, a small fraction of an acre, and a little more than one acre. They were unsurveyed and of no apparent value."

The court said:

"We cannot think that these provisions excepted such islands from the admitted transfer to the state of the bed of the streams surrounding them. If they did not, then, whether the title remains in the state or passes to the defendant with the land conveyed by the patent, the bill must fail. The bed of the river could not be conveyed by the patent of the United States alone; but, if such is the law of the state, the bed will pass to the patentee by the help of that law, unless there is some special reason to the contrary to be found in cases like Illinois Central R. R. Co. v. Illinois, 146 U. S. 387 [13 Sup. Ct. 110, 36 L. Ed. 1018]."

[12] 2. As the fraud, even if we assume mistake, of the original survey was not discovered by the department of the government charged by law with the management of the public lands until December, 1908, when the Secretary of the Interior made his findings as hereinbefore set out, and the motion for review of that decision was not disposed of until February 27, 1909, the statute did not begin to run until that time.

The instructions for the survey were given by the General Land Office to the surveyors on March 15, 1910. The survey of these lands was begun on March 21, 1910, and completed April 9, 1910; the plat from the field notes of the surveyor approved by the Commissioner, who was ex-officio Surveyor General for Arkansas, on April 28, 1910; this action was instituted by filing the bill of complaint and causing process to be issued on August 4, 1911.

Considering the many steps necessary to be taken by the different officers of the General Land Office, and the time required for the Department of Justice, after the Land Department requested it to institute these proceedings, to familiarize itself with the facts necessary for the preparation of the bills, the government acted in this matter with unusual celerity. The courts must take judicial notice of the rules and regulations of the departments of the government, and also the fact that a government as large as ours cannot move as rapidly as individuals unhampered by such rules and regulations.

The letter of the special agent, referred to by Secretary of the Interior Hitchcock in his letter of November 17, 1902, shows that the special agent acted in that matter on his own initiative and without authority from the department. He merely expressed his opinion from what he had heard. His letter has not been introduced in evidence, but the letter of the Secretary of the Interior, which is in evidence, shows sufficiently what it contained. The Secretary says:

"A special agent of your office states in his report that in an interview with the officers of said board [meaning the levee board] he learned that it claimed title to the lands in question under the act of March 29, 1893 [the act of the General Assembly of the state of Arkansas granting all of its lands in that section of the state to the St. Francis levee district], and also bases its claim upon letters from your office and from the Secretary of the Interior, declaring, in effect, that if the unsurveyed lands, known as the 'Sunk Lands,' were at the date of the township surveys covered by bodies of water, and were afterwards uncovered by the recession of the waters, such lands would belong to the owners of the adjacent lands as riparian proprietors, and the United States would have no authority to survey and dispose of them, assuming that the lands contiguous to and surrounding the meandered waters have been disposed of. The special agent expresses the opinion that there is no doubt that at the time of the township surveys these lands were simply covered by the overflow of the Mississippi river, and that they may be classed as agricultural lands, and not as covered by permanent bodies of water, and therefore subject to state or riparian ownership; that some of these lands are five miles wide and are covered with the finest timber, which is exceedingly valuable, and when cleared will make fine cotton and corn plantations and become some of the most valuable ones in the state."

Such a communication, made by a subordinate employé of the department, who is not even an officer of the United States (United States v. Schlierholz [D. C.] 133 Fed. 333, and United States v. Schlierholz [D. C.] 137 Fed. 616), without authority from the department, and merely expressing his own opinion, without having taken any evidence or made any personal investigation upon which his opinion is based, can hardly be said to be notice to the government, which can only act through its officers, and for that reason is not chargeable with notice as strictly as an individual. United States v. Kirkpatrick, 9 Wheat. 735, 6 L. Ed. 199; Cooke v. United States, 91 U. S. 389, 398, 23 L. Ed. 237; United States v. Beebe, 180 U. S. 343, 354, 21 Sup. Ct. 371, 45 L. Ed. 563.

Nor is the claim that, as that statute contains no exceptions, the general rule that, in case of a concealed fraud, the statute of limitations does not begin to run until the discovery of the fraud, does not apply, tenable. That this statute does not begin to run until the discovery of the fraud has been conclusively determined by the Circuit Court of

Appeals of this circuit in United States v. Exploration Co., 203 Fed. 387, 121 C. C. A. 491, and Moses v. Long Bell Lumber Co., 206 Fed. 51, 124 C. C. A. 185.

## Bona Fide Purchaser.

[13] It is also claimed that the defendant is a bona fide purchaser for value, and therefore within the provisions of section 3 of the Compromise Act of 1898, hereinbefore set out.

The testimony of Mr. Wilson, under whom the defendant claims, shows that he is the owner of practically the entire capital stock of the defendant corporation, and may, therefore, be said to be the corporation. He testified that he owns all the stock of the defendant corporation, except what his wife and son and W. L. Harrison and some of the boys might own, a share that he gave them to hold office. He further testified that, while he could not tell the exact number of shares owned by him, it was something over 90 per cent. Some of the shares he gave to his children a few days before testifying. From this it is reasonable to presume that he and his donees, his wife and children, own 998 of the 1,000 shares of the capital stock of the defendant corporation. The corporation was no doubt formed for the purpose of enabling him to carry on his very extensive interests without the danger of having them injuriously affected or destroyed in case of his death; he being a man well advanced in years. In any event, as he is the president of that corporation, and practically its owner, his knowledge is the knowledge of the corporation.

As the state never owned these lands, and it only attempted to convey the lands which it owned, i. e., "according to the official plats of survey of the said lands returned to the General Land Office by the surveyor general," and as by the Compromise Act of 1898 the St. Francis levee district, under whom defendant claims title, had been divested of all right, title, and interest, legal or equitable, it had nothing to convey, so far as these or any other unsurveyed lands are concerned, after April 29, 1898, the date of the enactment of the act of 1898, even though they were in fact swamp and overflowed lands, and theretofore had been, under the act of 1850, subject to selection by the state. All of these lands were purchased by Mr. Wilson some time after the Compromise Act of 1898 had been enacted, which, as construed in Little v. Williams, supra, and Chapman & Dewey Lumber Co. v. St. Francis Levee District, supra, had been quitclaimed to the government by the compromise.

The evidence shows that the levee district sold the lands in section 22 on June 6, 1898, those in section 26 on June 3, 1898, and those in section 27 on June 6, 1898, nearly two months after the passage of the Compromise Act of 1898. Whether the enactment of this act caused these conveyances to be made so soon thereafter must be left to conjecture. But the divestiture of its title was then complete.

Mr. Wilson bought the lands in section 22 on November 24, 1900, and September 23, 1902, those in section 26 on June 3, 1898, and September 23, 1902, and those in section 27 on November 24, 1900, and September 23, 1902. In addition to these facts, his own testimony shows that, before he purchased the lands, he knew that the title was

still in the government. Referring to his testimony, we find the following:

"Q. Did you have the title examined at the time you bought the interests of these gentlemen, far enough back to ascertain they had no title to the lands within the meander lines? A. I had the title examined, and it showed that they had the title to the lands by the levee board title. Q. That is to say, their title, so far as representing any section as an entirety, was deraigned from the levee board? A. Yes, sir. Q. There was no title so far as you know to any land within the meander line, which can be deraigned by an examination of the records of Mississippi county by a patent from the United States government? A. You mean the unsurveyed land? Q. Yes, sir. A. No, sir. Q. So that at the time you purchased from the the St. Francis levee board, or any of its grantees, the lands which purport to be included within the meander line, and when you purchased the lands which may be specifically described as fractional sections about the meander line, you knew that the title which you were acquiring did not emanate from the government by its patent as unsurveyed lands? A. I knew that the unsurveyed lands had not been patented by the government. Q. You acquired, did you, Mr. Wilson, or, that is, the defendant acquired, the title to all this land abutting on the meandered line, whether described as fractional sections or whole sections? A. Yes, sir. Q. And you now say that no part of the alleged shore line, or the present meander line, bounds any part of the surveyed lands of which the title is in some other person besides this defendant company? A. No."

The court finds from the evidence that the defendant is not a bona fide purchaser without notice, and therefore is not entitled to protection as such, without deciding whether, in view of the other findings, even had it been a bona fide purchaser without notice, that would have aided it.

## Estoppel.

[14] The defendant also claims an estoppel on the part of the United States. There can be no doubt that in a suit in equity the claims of the government appeal to the conscience of the chancellor with the same, but with no greater or less, force than those of private individuals under like circumstances, and they are determinable by the same rules and principles. State of Iowa v. Carr, 191 Fed. 257, 112 C. C. A. 477; Hemmer v. United States, 204 Fed. 898, 123 C. C. A. 194, and authorities there cited. It is equally well settled that the government cannot be estopped by the unauthorized or fraudulent acts of its agents or officers, or their mistakes. Hunter v. United States, 5 Pet. 173, 8 L. Ed. 86; The Floyd Acceptances, 7 Wall. 666, 19 L. Ed. 169; Filor v. United States, 9 Wall. 45, 48, 19 L. Ed. 549; Whiteside v. United States, 93 U. S. 247, 257, 23 L. Ed. 882; Moses v. United States, 166 U. S. 571, 594, 595, 17 Sup. Ct. 682, 41 L. Ed. 1119; Pine River Logging & Imp. Co. v. United States, 186 U. S. 279, 291, 22 Sup. Ct. 920, 46 L. Ed. 1164.

[15] To cause an estoppel, the representations relied on must have been made with full knowledge of the facts by the party to be estopped, unless his ignorance was the result of gross negligence or otherwise involved gross culpability. Henshaw v. Bissell, 18 Wall. 255, 271, 21 L. Ed. 835; Brant v. Iron Company, 93 U. S. 326, 336, 23 L. Ed. 927; Farmers' & Merchants' Bank v. Farwell, 58 Fed. 633, 7 C. C. A. 391.

Another essential element of estoppel is that the party pleading it should have relied and acted upon the conduct of the other, and be

induced to act or refrain from acting, so that he will be substantially injured if the other party should be allowed to repudiate his actions. Brant v. Iron Company, supra; Ketchum v. Duncan, 96 U S. 659, 666, 24 L. Ed. 868; Bloomfield v. Charter Oak Bank, 121 U. S. 121, 131, 7 Sup. Ct. 865, 30 L. Ed. 923; Comer v. Felton, 61 Fed. 731, 738, 10 C. C. A. 28, 35; New York Life Ins. Co. v. Slocumb, 177 Fed. 842, 101 C. C. A. 56; State Bank v. Hawkeye Gold Dredging Co., 177 Fed. 164, 100 C. C. A. 626; Rhodes v. Cissel, 82 Ark. 367, 101 S. W. 758.

[16] There can be no estoppel by what was said or done by the government officials prior to the compromise between the state and the United States in 1898, for up to that time it was wholly immaterial whether this land was a lake or whether it was merely swamp land. If it was a lake, it passed to the state and its grantees by virtue of the riparian ownership; if it was dry land, but subject to overflow, the inchoate and equitable title passed to the state under the swamp land grant of 1850 and the act of 1857, which could be perfected when the land was surveyed. United States v. Montana Mfg. Co., 196 U. S. 573, 25 Sup. Ct. 367, 49 L. Ed. 604. But by the Compromise Act of 1898 the state relinquished all lands granted to it, whether patented or held by an inchoate and equitable title under these acts, and then, for the first time since the passage of the act of 1850, the United States again became the absolute owner of the legal and equitable title, which had been granted to the state and not sold by it. As the title to none of the unsurveyed lands had ever passed from the United States to the state of Arkansas, the legal title to these lands, if not covered by a lake or a permanent body of water, never vested in the state, as has been shown hereinbefore.

In French-Glenn Live Stock Co. v. Springer, supra, it was contended that the land was bought in reliance upon the plats and patent, which showed the meander line of the lake; but it was held that, if there was in fact no lake, the grantee acquired no part of the meandered area.

As to the letters of the department, they were in reply to inquiries made by different parties; they were no decisions, but merely expressions of opinion as to the lands in controversy, based upon the facts as shown by the records of the department. There was no contest before the department as to these lands which called for a decision; there were no parties before it seeking an adjudication; there were no issues to be decided; no one had an opportunity to be heard. For this reason it was held in Chapman & Dewey Land Co. v. Bigelow, 77 Ark. 338, 351, 92 S. W. 534, 539, where similar lands were involved, that such letters are "of no binding force or effect upon any one," and that they were "properly excluded" by the trial court.

But even if these letters are admissible, nothing was said or done by any authorized official of the government which would cause an estoppel. In 1892 Mr. Wilson wrote to the Commissioner of the General Land Office, asking how he could obtain title to the lands situated in lakes and bayous in Mississippi county. The Commissioner of the General Land Office, under date of January 13, 1893, replied:

"Where the lands or lots bordering upon the lakes have been entered or disposed of by the government in accordance with the official plats, they are not subject to survey and disposal by the United States, for the reason that they belong to the adjacent landowner."

This is one of the letters upon which defendant bases its plea of estoppel. On November 30, 1894, the Secretary of the Interior, Mr. Hoke Smith, advised the Commissioner of the General Land Office as follows:

"Assuming that the lands contiguous and surrounding the meandered lakes have long since been disposed of, it would seem, under the authorities cited, that the government has no jurisdiction over the same, and therefore no power to order or direct the survey, and you will so advise the surveyor of the levee board."

This letter was written in reply to an inquiry made by the secretary of the St. Francis levee board, dated June 26, 1894, transmitting a letter from its chief engineer. In that letter the chief engineer stated that these lands were occupied by lakes which were not surveyed, and that by the numerous overflows since then those lakes have been filled, changing the general features of them to such an extent that the areas and depths of the lakes and swamps have been very much reduced, and surrounding the margins forests and large timber now stand on the space then occupied by water; that in order to drain the lands in that basin and locate the levees these lakes must be drained; and he then states that he is informed that "the title to these unsurveyed lands yet remains in the government, and that it donate these lands to the state or to the levee board to be expended in their drainage," and that they will ask Congress at its next session to donate these lands for that purpose; and in order to give an accurate description it will be necessary to survey them, and asked that such a survey be made.

. In every one of the letters written by the Secretary of the Interior to the Commissioner of the General Land Office or to individuals inquiring about them, these lands are assumed by him and the Commissioner to have been covered by a permanent lake at the time the original survey was made, and there was no suspicion entertained by any of them that that survey was fraudulent or mistaken, and that these lands were, in fact, not covered by lakes or any other bodies of water of a permanent nature. Secretary Hitchcock, in his letter of November 17, 1902, quotes from another letter of the chief engineer of the St. Francis levee district of September 3, 1901, the following:

"If the general government has no jurisdiction of these unsurveyed lands, and does not claim any, and if a survey of them cannot, therefore, be made by the government, then it is the purpose of our board to have them surveyed, and sell them or quitclaim them, and place them on our levee tax books, so that they may be taxed for levee purposes and pay their proportion towards the construction of levees and drains by which they have been and are being so greatly improved and benefited. If the general government will survey them, so that we can tax them when parties buy them from the government or homestead them, then our purpose will be equally accomplished.".

This clearly shows that at that time the levee district did not consider these lands as belonging to it. The Secretary said:

"Therefore the condition existing at the date of the township surveys is the important fact to be ascertained, in order to determine whether steps should be taken to prevent depredations on these lands. The returns of the township surveys [referring to those made in 1839 and 1840] show upon their face that what are now alleged to be unsurveyed portions of said townships were then actual bodies of water and were properly meandered as such. There is nothing in the report of the special agent, or any of the papers submitted therewith, to impeach these returns as to the physical conditions of land and water at that time. * * * The action of the board of directors of the St. Francis levee district in exercising any control over said lands appears to have been prompted by the disclaimer of jurisdiction and authority over them by the government, as expressed in the letters of your office and of the department above referred to, and such disclaimer was based upon the information furnished by the records of your office, which show that the authority and jurisdiction of the government over said lands was terminated by the approval of the surveys and the sales of the land along the meandered lines. It does not appear from anything in the record whether the body of water that once covered the lands in question was navigable or not, but the result would be the same in either case. * * * It not being shown that said waters were not properly meandered, and the jurisdiction and control of the government over the lands in question having thus been terminated, the action of the department of November 30, 1894 [refusing a survey], is adhered to, and no further or other action will be taken with reference to said lands."

The entire correspondence shows conclusively that what was said or done by the department officers was in ignorance of the true fact that these lands were not covered by a permanent body of water, and that there was no lake there. No official investigation had been made at the time; not until 1908 did the Secretary of the Interior, upon information received, as to these lands, from parties who were anxious to acquire them as homesteads, take any steps to ascertain the true condition of these lands at the time the survey was made. For the purpose of ascertaining the true condition of these lands at that time, he set a day for a public hearing, at which, after notice to the parties in interest, representatives of all the different claimants appeared. After that hearing, on December 12, 1908, he made the findings hereinbefore set out and ordered these lands to be surveyed. The officials of the Land Department had, up to that time, the right to presume that the original survey was correct, and that these were submerged lands, as the field notes made by the surveyor and the plats made therefrom were, as is claimed by the defendant, prima facie evidence that the lands were as described in the field notes.

In the opinion of the court, the evidence fails to establish any authorized acts of any officer of the Department of the Interior which would justify sustaining the plea of estoppel; nor does the evidence justify a finding that the defendant, when it purchased these lands, relied and acted upon the conduct of the Land Department, and that by reason thereof it will be substantially injured if the government should now be permitted to recover these lands from it.

The opinion is more lengthy than is necessary, as the same result might have been reached without passing upon all the issues raised and herein determined. But as this is a test case, on which a number of other actions in this court are depending, and as counsel for both parties ably argued every one of these questions, and asked the court to pass upon all of them, the court did so. In addition to these reasons,

the court felt that as, owing to the magnitude of the interests involved, about 80,000 acres of land in all the actions, this cause will likely be appealed to a higher court, it would be best for all concerned that every material issue raised by the pleadings and insisted on in the argument should be decided by the trial court.

The plaintiff is the owner of the lands in controversy, and a decree in conformity with the prayer of the bill may be prepared and submitted to the court for its approval.